IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AKBAR LAKESTANI,<br><br>　　　　*Plaintiff*,<br><br>　　　v.<br><br>THE ISLAMIC REPUBLIC OF IRAN;<br><br>SEYED ALI HOSSEINI KHAMENEI, The Supreme Leader of the Islamic Republic of Iran;<br><br>THE ISLAMIC REVOLUTIONARY GUARD CORPS; and<br><br>HOSSEIN SALAMI, Commander-in-Chief of the Islamic Revolutionary Guard Corps,<br><br>c/o Ministry of Foreign Affairs<br>Khomeini Avenue,<br>United Nations Street<br>Tehran, Iran<br><br>　　　　*Defendants*. | Case #: 1:21-cv-2232 |

## COMPLAINT

1. Plaintiff, Mr. Akbar Lakestani, by and through his undersigned counsel, brings suit against Defendants the Islamic Republic of Iran, Supreme Leader Seyed Ali Hosseini Khamenei, the Islamic Revolutionary Guard Corps ("IRGC"), and IRGC Commander-in-Chief Hossein Salami (collectively "Defendants") under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et seq.* ("FSIA"), for severe personal injuries and other irreparable harm suffered as a result of Defendants' unlawful acts of torture, hostage taking, and other torts against Plaintiff.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this matter and over Defendants pursuant to 28 U.S.C. §§ 1330(a), 1330(b), 1331, 1332(a)(2) and 1605A(a)(1), which create subject matter jurisdiction and personal jurisdiction for civil actions for personal injuries against State Sponsors of Terrorism and their officials, employees, and agents.

3. 28 U.S.C. § 1605A(c) provides a federal private right of action against a foreign state that is or was a State Sponsor of Terrorism, and also against any official, employee or agent of that foreign state while acting within the scope of his or her office, employment or agency,

1

   for personal injury and related torts.

4.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(f)(4).

## PARTIES

5.  Plaintiff Mr. Akbar Lakestani is a dual national Iranian-American journalist and human rights activist. In 2019, Plaintiff was arrested by border patrol law enforcement officers in Iran and accused of being in contact with and working for groups in opposition to the Iranian regime. During his wrongful arrest and subsequent detention, he was interrogated and subjected to torture by Iran and its agents.[1]

6.  Defendant the Islamic Republic of Iran is a foreign state. Iran is a theocratic republic with an elected head of government and a head of state—the Ayatollah or Supreme Leader—appointed for life by a council of theologians. The Supreme Leader controls the Guardian Council of the Constitution, which interprets the Iranian Constitution, supervises elections (including determining which candidates may run), and exercises significant influence over the legislative, executive, and judicial branches of government, as well as the military and the IRGC.

7.  Defendant Seyed Ali Hosseini Khamenei has been Iran's Supreme Leader since 1989. He was previously the President of Iran from 1981 to 1989. As Supreme Leader, Khamenei is the head of state of Iran and the commander-in-chief of its armed forces. For this reason, he is considered the most powerful political authority in the country. As Supreme Leader, Khamenei can issue decrees and make the final decisions on the main policies of the government in fields such as the economy, the environment, foreign policy, and national planning within Iran. Khamenei has direct control over the executive, legislative and judicial branches of government, as well as the military and media. In 2019, President Donald J. Trump imposed secondary sanctions on Khamenei, stating that:

> "in light of the actions of the Government of Iran…to promote international terrorism…hereby order: Section 1. (a) All property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in: (i) the Supreme Leader of the Islamic Republic of Iran and the Iranian Supreme Leader's Office (SLO)".[2]

8.  Defendant the Iranian Revolutionary Guard Corps ("IRGC") is a military organization

---

[1] United 4 Iran, *Akbar Lakestani*, https://ipa.united4iran.org/en/prisoner/5327/.
[2] Exec. Order No. 13876, 84 Fed. Reg. 30574 (June. 26, 2019).

under the control of the Guardian Council. The IRGC was established in the wake of the Islamic Revolution to act as the country's "ideological custodian"[3] and is generally understood to be one of the most reactionary, powerful, and oppressive factions of the Iranian Government. The IRGC fields an army, navy, air force, and intelligence service, and it conducts foreign operations through its paramilitary arm, the Quds Force. The Quds Force has primary responsibility for arming pro-Iranian military groups across the Middle East and beyond, and has been designated by the U.S. Department of Treasury as a sponsor and supporter of terrorism.[4]

9. Defendant Hossein Salami has been the Commander-in-Chief of the IRGC since April 2019. He has the responsibility of overseeing all methods of torture and interrogation used by IRGC security forces. He is personally liable for the acts of IRGC agents in torturing Plaintiff.

## STATEMENT OF FACTS

10. Mr. Lakestani was living in the U.S. when he decided to travel to Iran to visit his elderly and ill mother. On September 28, 2019, he was traveling through the city of Serow, on the border of Turkey and Iran, when he crossed the border into Iran. Upon doing so, his passports were checked by Iranian law enforcement officers. While his documents were being reviewed, he was informed by the officer in charge that, based on the information in their system, he was barred from leaving Iran. He was not given a reason and was told he had to look into it himself if he wanted answers.[5]

11. These officers confiscated Mr. Lakestani's passport and asked him to fill out a form with information about his travels, including the dates of his previous entries into Iran and his reasons for returning. While he was waiting for this form to be processed, plainclothes officers arrived, introduced themselves as IRGC officers, and then took Mr. Lakestani into custody. These officers tied Mr. Lakestani's hands behind his back, blindfolded him, and told him to be quiet and that he was being taken to be interrogated. They put him into a vehicle and drove him to an undisclosed location, though he could gather that it was an

---

[3] CFR.org Editors, *Iran's Revolutionary Guards*, COUNCIL ON FOREIGN RELATIONS (May 6, 2019), https://www.cfr.org/backgrounder/irans-revolutionary-guards.
[4] U.S. DEP'T OF TREASURY, *Sanctions Programs and Country Information*, www.treasury.gov/resource-center/sanctions/Programs/Documents/terror.pdf.
[5] United 4 Iran, *Akbar Lakestani*, https://ipa.united4iran.org/en/prisoner/5327/.; Kampain, *Akbar Lakestani, and Iranian-American Dual Citizen, was Arrested During His Return to Iran*, https://www.kampain.info/archive/37853.htm.

intelligence agency.

12. Upon arrival at the undisclosed location, officers removed Mr. Lakestani's blindfold and then forced him to strip down and change his clothing in front of several officers while they spoke to him in insulting language. After this invasive and humiliating procedure, he was questioned again and then sent to a jail cell for holding overnight where he was denied medication for his diabetes.

13. The following day, Mr. Lakestani was taken to another room where he was shown recordings of interviews he had participated in outside of Iran in which he had spoken against the Iranian regime. He was then further questioned about his activities and transferred back to his cell. After a period of time, he was again cuffed and blindfolded and transferred to the Prosecutor's office, where he was questioned by the Deputy Prosecutor along with two non-uniformed officers in attendance, who he was told were from the IRGC. The Deputy Prosecutor removed his case to the Urmia Revolutionary Court, and Mr. Lakestani was transferred to the Central Prison of Urmia on October 3, 2019.[6]

14. Upon arriving to the prison, Mr. Lakestani was handed over to IRGC officers and detained. The following day, Mr. Lakestani was taken to an interrogation room and questioned. Partway through the interrogation, Mr. Lakestani was blindfolded and questioned by new, unidentified individuals about why he had left Iran, who he was working for, and whether he was a spy. He was accused of being unpatriotic towards Iran and spying for the United States, and was told by one of his interrogators, "your activism is more dangerous than armed conflict." He was told that his case was so serious that if he did not cooperate with them and provide a list of all the information he knew about the United States and the names of traitors he knew, he could be facing the death penalty. Mr. Lakestani told his interrogators that he did not know anything. Even so, he was relentlessly interrogated until he burst into tears. His interrogators implicitly threatened that if he did not cooperate with them then he would never see his son or daughter again.

15. While detained, Mr. Lakestani was denied access to his medication for diabetes. As a result of both the denial of this medication and being forced to walk without shoes, his feet bled so badly that they stained the carpet of his cell. He showed his guards the bloodstains and begged for access to his medicine, but his pleas were ignored and he was beaten for being

---

[6] United 4 Iran, *Akbar Lakestani*, https://ipa.united4iran.org/en/prisoner/5327/.

too demanding. Mr. Lakestani was not permitted to call anyone, including his family, and was cut off from the outside world. Eventually he was examined by a doctor in the IRGC-controlled prison, who determined that his blood sugar was very high and advised him to get back on his medication quickly. The evaluating doctor informed the officers in charge of Mr. Lakestani that if he was not given his medication or transferred to a hospital immediately, he could be in serious trouble and said, "If you want to interrogate a dead guy that's on you, but I will not accept any responsibility regarding him." However, even after this evaluation, Mr. Lakestani was still not allowed access to his medication.

16. The following day, the interrogations resumed. Mr. Lakestani was eventually transferred to the interrogation office in the sixth branch of the Urmia Revolutionary Court, where he was charged with cooperating with anti-regime groups and insulting the Supreme Leader. A bail amount of 300 million tomans (approximately $30,000 USD) was set for his temporary release prior to court proceedings. He was held in the Urmia Central Prison, where he was placed in a hall with prisoners who had been charged with violent criminal offenses. Every day, Mr. Lakestani witnessed violent fights breaking out among his fellow prisoners involving weapons made of metal pieces from the prison beds. These fights were frequently over contraband drugs which were widely available in the prison. Upon arriving to the prison, he had most of his belongings stolen from him by other inmates, who told him that if he did not keep quiet they would kill him or plant drugs on him to be discovered by the authorities, for which he would face the death penalty. He feared for his life.

17. As a result of the unsafe prison conditions, Mr. Lakestani begged in vain to be placed in solitary confinement. Eventually, on October 19, 2019, he began a hunger strike which lasted for a total of 14 days.[7] In response, the authorities threatened him that if he did not end his hunger strike, he would "face bad consequences." During his strike, he was taken by prison guards into the prison yard where executions were performed. Stricken with fear, he asked what was happening and why he had been brought into the yard, and he was told it was only for him to "take a breath".

18. Towards the end of his strike, after 10 days without food and an additional 4 days without food or water, Mr. Lakestani's condition had deteriorated so severely that he fell unconscious and was transported to Imam Khomenei Hospital where he was injected with

---

[7] *Id.*

5

glucose. When he was revived, he realized that he had been shackled at the hands and feet to his hospital bed. He attempted to speak to the hospital staff and to tell anyone in proximity who he was and why he had been brought there, which angered his guards. They closed the curtains around his bed and violently beat him, causing a commotion so loud that others in the hospital could hear and began to protest.

19. Mr. Lakestani was then injected with an unknown substance that rendered him unconscious and transported to a more secure part of the hospital designated for prisoners. His stay in this part of the hospital was in even worse conditions than the IRGC-controlled Urmia Prison, with no windows and visible filth and odors. Mr. Lakestani was berated by his guards, who called him a "traitor" and "spy" and spit on him. He attempted a second hunger strike for two days in protest, but was locked to the bed so tightly that he was unable to move.

20. From Imam Khomenei Hospital, Mr. Lakestani was transferred to Razi Psychiatric Hospital, where he was placed in the most dangerous section along with the extremely violent and unstable patients, which he believes was done to further break his morale. He was given medications that were not prescribed or identified to him by the physicians, and which caused him to sleep for much of the time he was detained there.

21. While at Razi Psychiatric Hospital, his hands were cuffed behind his back in such a way that caused severe pain to his shoulder joints, which he still suffers from today. He was also cuffed around his feet in such a way that caused his ankles to bleed and to become infected. Mr. Lakestani later found out that his doctor at Razi Hospital had written to the judge in his case and protested his extraordinary mistreatment, demanding that he be transferred to a medical hospital to treat his foot infections. He was eventually transferred to Taleghani Hospital for treatment, but was then transferred back to Urmia Prison.

22. Though Mr. Lakestani's family had paid the required bail, he was still not released. As news of his arrest became more widespread, the Central Prison of Urmia eventually agreed to release him on bail after 47 days. However, his family was not notified of his release, so Mr. Lakestani was released into the city while still wearing his prison clothes and without any of his personal belongings.

23. During Mr. Lakestani's period of temporary release on bail, beginning November 13, 2019, he was called back for more interrogations in Urmia, including three times to the court,

        two times to the prosecutor's office, and again after the assassination of General Qasem Soleimani.[8] He was asked to write something about Soleimani's death and to condemn the U.S. government's actions in killing him, but Mr. Lakestani refused to do so. He was threatened and told that if he did write what he was asked then it could be helpful in his case, but he still refused.

24. On February 9, 2020, Mr. Lakestani fled Iran. He entered Turkey through the land border of Bazargan, and then flew to the United States on February 20, 2020. Though he has not been formally informed of his sentencing *in absentia*, his mother's house, which had been put up for his bail, is now in the process of being confiscated by the Iranian government.

## COUNT I
## PRIVATE RIGHT OF ACTION (28 U.S.C. 1605A(c))

25. Plaintiff incorporates by reference the allegations of the preceding paragraphs.

26. Iran is a state sponsor of terrorism as described in 28 U.S.C. §1605A(a)(2)(A)(i).

27. Iran and its agents were acting within the scope of their office, employment, or agency in committing the acts alleged herein, including, but not limited to, the hostage taking and torture of Mr. Akbar Lakestani.

28. As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of the IRGC and its agents, which were funded and directed by the Islamic Republic of Iran and other Iranian government entities, Plaintiff has suffered, *inter alia*, physical pain and suffering, emotional pain and suffering, and economic losses resulting from Defendants' acts.

29. Pursuant to 28 U.S.C. §1605A(c), Plaintiff, who is a national of the United States, may assert a cause of action against Defendants for personal injury that was caused by acts of hostage taking and torture, or the provision of material support or resources for such acts, if performed or provided by an official, employee, or agent of Iran while acting within the scope of his or her office, employment, or agency.

30. Mr. Lakestani became a U.S. citizen on March 13, 2018.

31. Mr. Lakestani suffers ongoing physical and psychological pain as a direct result of his mistreatment by Defendants. This suffering includes post-traumatic stress disorder, depression, a sleep disorder, nightmares, and extreme shoulder pain. He receives ongoing

---

[8] United 4 Iran, *Akbar Lakestani*, https://ipa.united4iran.org/en/prisoner/5327/.; Kampain, *Akbar Lakestani, and Iranian-American Dual Citizen, was Arrested During His Return to Iran*, https://www.kampain.info/archive/37853.htm.

medical and psychological treatment for this suffering.

32. Accordingly, as a result of Defendants' actions, Plaintiff seeks compensatory and punitive damages. Plaintiff is asking for One Hundred Million USD ($50,000,000) in compensatory damages and Five Hundred Million USD ($300,000,000) in punitive damages.

## COUNT II
## ASSAULT AND BATTERY

33. Plaintiff incorporates by reference the allegations of the preceding paragraphs.

34. "An actor is subject to liability to another for assault if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such contact, and (b) the other is thereby put in such imminent apprehension."[9]

35. Under the FSIA, hostage taking and torture constitute assault because "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm."[10]

36. Mr. Lakestani was held hostage and tortured by Defendants, resulting in harmful contact and fear of such harmful contact.

37. While in Defendants' custody, Mr. Lakestani was routinely subjected to harmful and offensive contact, including being forcibly moved at gunpoint, beatings, being forcibly injected with unknown substances without his consent, and other forms of torture.

38. Furthermore, while in Defendants' custody, Mr. Lakestani was frequently threatened with harmful and offensive physical contact, including threats of death and dismemberment. These threats placed Mr. Lakestani in imminent apprehension of death, torture, abuse, and other physical and emotional injuries. He constantly feared for his health and safety.

39. Plaintiff seeks damages to compensate for his continuous pain and suffering, to be calculated at trial.

## COUNT III
## FALSE IMPRISONMENT

40. Plaintiff incorporates by reference the allegations of the preceding paragraphs.

41. "An actor is subject to liability to another for false imprisonment if (a) he acts intending to confine the other or a third person within boundaries fixed by the actor, and (b) his act directly or indirectly results in such a confinement of the other, and (c) the other is

---

[9] Restatement (Second) of Torts § 21 (Am. Law Inst. 1965).
[10] *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76 (D.D.C. 2010).

8

conscious of the confinement or is harmed by it."[11]

42. The unlawful arrest and imprisonment of Mr. Lakestani by Defendants constitutes false imprisonment.

43. Defendants unlawfully detained Plaintiff in multiple prisons and detention facilities. Mr. Lakestani was fully aware of this illegal detention. Furthermore, this illegal detention directly caused Mr. Lakestani to suffer physical, psychological, and economic harm.

44. Plaintiff seeks damages for this count to be calculated at trial.

## COUNT IV
## HOSTAGE TAKING AND TORTURE UNDER THE FSIA

45. Plaintiff incorporates by reference the allegations of the preceding paragraphs.

46. The FSIA confers jurisdiction on the courts of the United States and creates an independent federal cause of action to recover for injuries sustained as a result of terrorist acts, such as hostage taking or torture. Under the statute, Plaintiff must prove that (1) there was an act of "hostage taking" or "torture"; (2) the act was committed by the foreign state or "an official, employee, or agent of such foreign state"; and that (3) the act "caused" (4) "personal injury or death" (5) "for which the courts of the United States may maintain jurisdiction under this section for money damages."[12]

47. Seizing an individual in an effort to extract information from him to be used against him and others constitutes hostage taking within the definition upon which the FSIA relies.

48. Mr. Lakestani was seized by Defendants' agents and detained while under their full control and in their physical custody. During this time, Mr. Lakestani was detained without due process. For example, he was denied access to legal counsel.

49. There is significant and compelling evidence that Defendants tortured Mr. Lakestani to compel him to present forced and falsified testimony against himself and other political activists.

50. Mr. Lakestani's prolonged detention and torture resulted in physical injuries, including extreme pain to his feet and shoulders. This pain was so severe that his feet bled and became infected. Furthermore, his shoulder pain continues to this day. In detention he was denied necessary medical care and medication. He was injected with unknown substances, without his consent, to make him compliant and to potentially induce confession. These injections

---

[11] Restatement (Second) of Torts §35 (Am. Law Inst. 1965).
[12] 28 U.S.C. §1605A(a)(1) & (c); *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 10-11 (D.D.C. 2010).

have had unknown health effects.

51. Mr. Lakestani's prolonged detention and torture further resulted in psychological suffering due to, *inter alia*, lack of medical care, inadequate nutrition, interrogations, physical distress, threats, intimidation and disorientation, and denial of due process. While in prison, Mr. Lakestani experienced severe depression. Today, he continues to suffer from depression in addition to a sleep disorder, nightmares, and post-traumatic stress disorder.

52. Plaintiff seeks damages for this count to be calculated at trial.

## COUNT V
## TORTURE UNDER THE TVPA
### Against Defendants: Seyed Ali Hosseini Khamenei and Hossein Salami

53. Plaintiff incorporates by reference the allegations of the preceding paragraphs.

54. The Torture Victim Protection Act of 1991 ("TVPA") provides a civil right of action for individuals who have been subjected to torture or extrajudicial killing. "An individual who, under actual or apparent authority, or color of law, of any foreign nation subjects an individual to torture shall, in a civil action, be liable for damages to that individual."[13]

55. The TVPA defines torture as:

> "[A]ny act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual . . . information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual . . . and (2) mental pain or suffering refers to prolonged mental harm caused by or resulting from (A) the intentional infliction or threatened infliction of severe physical pain or suffering; (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality; (C) the threat of imminent death . . ."[14]

56. Mr. Lakestani experienced severe pain and suffering, both physical and mental, intentionally inflicted upon him by Defendants during his detention. He was physically tortured through beatings, deprivation of food and water, and other methods, including the administration of undisclosed substances through injections without his consent. Mr. Lakestani was also psychologically tortured through threats of execution and the denial of access to legal counsel or contact with his family.

57. There is significant and compelling evidence that Defendants tortured Mr. Lakestani to

---

[13] 28 U.S.C. § 1350(2)(a)(1).
[14] 28 U.S.C. § 1350(3)(b)(1).

both punish him for his activism work and beliefs that are contrary to the Iranian regime's, and to compel him to present forced and falsified testimony against himself and other political activists.

58. Exhaustion of local remedies under the TVPA should be waived where such attempts would be obviously futile. Therefore, Plaintiff seeks damages for this count for One Hundred Million USD ($50,000,000).

## COUNT VI
## LOSS OF PROPERTY

59. Plaintiff incorporates by reference the allegations of the preceding paragraphs.

60. The FSIA allows for recovery for "reasonably foreseeable property loss…by reason of the same acts on which the action…is based." Specifically, Section 1605A(d) "contains two causation elements: (1) the property loss must come 'by reason of' the [hostage taking or torture], and (2) the property loss must be a 'reasonably foreseeable' result of [hostage taking or torture]."[15]

61. As a result of his unlawful arrest, detention, and torture, Mr. Lakestani was unable to work and provide for himself or his family. This further caused him to incur significant expenses. Furthermore, ever since fleeing Iran while on temporary release, he has been unable to secure employment due to the severe physical and psychological suffering he continues to endure, caused by Defendants. These losses occurred "by reason of" and were a "reasonably foreseeable" result of his hostage taking and torture.

62. Plaintiff seeks damages for this count.

## COUNT VII
## SOLATIUM

63. Plaintiff incorporates by reference the allegations of the preceding paragraphs.

64. Under the FSIA, a plaintiff may seek solatium damages, which "are functionally identical to claims for intentional infliction of emotional distress.".[16]

65. "An actor who by extreme and outrageous conduct intentionally or recklessly causes severe emotional harm to another is subject to liability for that emotional harm and, if the emotional harm causes bodily harm, also for the bodily harm."[17]

---

[15] *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 57 (D.D.C. 2012).
[16] 28 U.S.C. § 1605(A)(c)(4).; *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 27 (D.D.C. 2014).
[17] Restatement (Third) of Torts: Liability for Physical & Emotional Harm §46.; *See also Valencia*, supra note 12, at 14; *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 28 (D.D.C. 2008).

66. "All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience."[18]

67. Defendants' conduct—including assault, battery, false imprisonment, hostage taking, and torture—caused Plaintiff to suffer severe emotional harm, including depression, post-traumatic stress disorder, a sleep disorder, nightmares, and erectile dysfunction, all of which he continues to suffer from today.

68. Plaintiff seeks damages for this count to be calculated at trial.

## COUNT VIII
## PUNITIVE DAMAGES

69. Plaintiff repeats and realleges each and every allegation set forth above with like effect as if alleged herein.

70. The actions of Defendant the Islamic Republic of Iran, which has been committing, sponsoring, and supporting acts of international terror against international and domestic targets, have led to its decades-long designation by the U.S. Department of State as a State Sponsor of Terrorism.[19]

71. The acts of Defendants, each carried out by Defendants' agents as described above, were malicious, willful, unlawful and in wanton disregard of life and the standards of law that govern the actions of civilized nations. Plaintiff's injuries as above described were intended as a result by Iran. In accordance with the provisions of 28 U.S.C. §1605A(c), the Plaintiff is thereby entitled to a maximal award of punitive damages to the fullest extent of the law.

72. Iran, as a country with a history of human rights abuses and severe violations of international law, has caused the suffering of many who promote internationally acceptable norms and human rights. Many Iranians and foreigners, including Americans, have lost life, liberty, health, and property due to continued acts of terror conducted and/or supported by Iran.

73. This case is among few bringing light to domestic acts of terror by Iran against human rights activists and those fighting the brutal regime of Iran. The punitive penalty of such activities should be so high as to prevent Iran from violating international human rights, taking hostages and torturing individuals. Iran has an indefensible record of human rights abuses; it has been condemned internationally by each and every United Nations

---

[18] *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 (D.D.C. 2009) (quoting Stethem v. Islamic Republic of Iran, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)).
[19] *See* U.S. DOS, State Sponsors of Terrorism, https://www.state.gov/j/ct/list/c14151.htm.

commission.

74. Plaintiff prays that judgment be entered, jointly and severally, against Defendants in the amount of Five Hundred Million USD ($300,000,000).

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against all Defendants and respectfully requests the following relief:

75. Plaintiff is entitled to compensatory damages for assault and battery, false imprisonment, solatium, and other personal injury suffered as a result of the acts of hostage taking and torture committed by Defendants.

76. Plaintiff is entitled to aggravated damages for Defendants' cruelty and acts of torture and hostage taking.

77. Plaintiff is entitled to economic damages for his loss of property due to his inability to obtain employment, further due to severe physical and psychological suffering caused by Defendants.

78. Plaintiff is otherwise entitled to general damages and all other applicable damages.

79. Punitive damages should be assessed (under 28 U.S.C. § 1605A(c)).

80. The Court should award Plaintiff full costs and attorneys' fees as incidental damages and as otherwise appropriate.

81. The Court should grant such further and other relief as this Court deems just and proper.

Dated:  08/23/2021

Respectfully submitted,

_____
Ali Herischi, Esq. (MD0024)
Herischi & Associates LLC
7201 Wisconsin Ave., Suite 440
Bethesda, Maryland 20814
Phone: 301-363-4540
Fax: 301-363-4538
*Attorney for Plaintiff*