**THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AKBAR LAKESTANI,<br><br>            *Plaintiff*,<br><br>      v.<br><br>THE ISLAMIC REPUBLIC OF IRAN, et al.,<br><br>            *Defendants*. | Case No.: <u>1:21-cv-2232-JMC</u> |

## <u>PLAINTIFF'S SUPPLEMENTAL BRIEF ON DAMAGES</u>

Plaintiff, Akbar Lakestani, by and through his undersigned counsel, file this Supplemental Brief on Damages. In Plaintiff's Motion for Default Judgment, Plaintiff asserts past and future damages from intentional infliction of emotional distress. Plaintiff also reserved the right to assert compensatory damages in the form of medical expenses as a direct and foreseeable result of Plaintiff's torture by the Islamic Republic Guard Corps ("IRGC") during his detention in Iran. Herein, Plaintiff wishes to provide additional support for past pain and suffering, as well as assert additional economic damages that have developed since Plaintiff's motion for Default Judgment.

## <u>DEVELOPMENT OF FACTS</u>

Plaintiff filed a Motion for Default Judgment on January 27, 2023. Since that date, Plaintiff has endured additional medical complications significantly impacting his post-release

pain and suffering. Plaintiff has also incurred significant medical expenses as a result of the necessary medical procedures to treat the injuries incurred as a result of his torture.

## LIABILITY FOR COMPENSATORY DAMAGES

### 1. INTENTIONAL INFLECTION OF EMOTIONAL DISTRESS

In Plaintiff's Motion for Default Judgment, Plaintiff asserted the legal standard for granting damages for intentional infliction of emotional distress ("IIED") by the defendant and incorporates such legal analysis here.[1] Here, Plaintiff provides supplemental documentation to demonstrate the extent of Plaintiff's pain and suffering because of Defendant's unlawful conduct to support his claim for compensatory damages in the of $10,551,846.78.

### a. IIED during Captivity

Compensatory damages under a FSIA claim are permitted where the consequences of the defendants' acts are reasonably certain to occur, and the amount of damages are proven by a reasonable estimate. *See Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 213 (D.D.C. 2012). As asserted in Plaintiff's Default Judgment, Defendant intentionally inflicted severe pain and suffering on the Plaintiff in the form of torture. Persistent emotional distress and physical injuries are reasonably certain consequences of the kinds of methods Defendant employed. *See Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 163 (D.D.C. 2017).

Furthermore, Plaintiff's request for $470,000 in damages for IIED during Plaintiff's captivity is a 'reasonable estimate.' An award of $10,000 per day of pain and suffering experienced during captivity is in line with this Court's precedent for individuals who are the directly injured victims. *See Daliberti v. Repub. of Iraq*, 146 F. Supp. 2d 19, 25–26 (D.D.C. 2001) (awarding damages for pain and suffering both during and after captivity at $10,000 per

---

[1] Plaintiff's Motion for Default Judgment.

day of captivity); *Jenco v. Islamic Repub. of Iran*, 154 F. Supp. 2d 27, 37 (D.D.C. 2001) (same); *Cicippio et al. v. Islamic Repub. of Iran*, 18 F. Supp. 2d 62 (D.D.C. 1998) (awarding damages for pain and suffering at approximately $10,000 per day of captivity); *Anderson v. Islamic Repub. of Iran*, 90 F. Supp. 2d 107 (D.D.C. 2000) (same). As asserted in Plaintiff's Motion for Default Judgment, Plaintiff was detained for 47 days, amounting to $470,000 in damages for IIED during his captivity.

### b. Post-captivity IIED

Plaintiff has experienced pain and suffering from Defendant's Intentional Infliction of Emotional Distress after his release from prison. Based on Defendant's conduct and treatment of Plaintiff, pain and suffering was reasonably likely to occur and was in fact caused by Defendant's treatment. Pain and suffering caused by torture are "obviously … reasonably certain consequences of torture," as are mental disorders such as PTSD and depression. *Hekmati*, 278 F. Supp. 3d at 163; *see also Abedini v. Gov't of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 133 (D.D.C. 2019). Further, refusal to provide diabetic medication will reasonably cause poorly controlled diabetes and exacerbate symptoms associated with diabetes. *See Hill v. Republic of Iraq*, 328 F.3d 680, 685 (D.D.C. 2003) (remanding, though not rejecting the determination that failure to provide diabetic medication led to exacerbation of diabetic conditions).

#### i. *Post-Traumatic Stress Disorder*

As a result of Plaintiff's torture and detention, Plaintiff has been suffering from severe Post Traumatic Stress Disorder ("PTSD") and has been receiving psychological and psychiatric treatment since his return from Iran.[2] Plaintiff saw a psychiatrist, Dr. Mokhtarzadeh, a few days after his release from prison. He was diagnosed with a major depressive episode and PTSD as a

---

[2] *See* Exhibit 4, Doctor's Note, Dr. James Gracer, M.D. & Dr. Mona Afary, Ph.D, p. 1.

result of his torture and was given a variety of medication for treatment. Plaintiff displayed severe symptoms of depression, anxiety, insomnia, nightmares, agitation, and rage. In his diagnosis, Dr. Mokhtarzadeh expressed his belief that, based on the symptoms displayed, Plaintiff would likely require extensive treatment to cope with his traumatic experiences.[3]

Since his return to the United States, Plaintiff's symptoms persisted and Dr. Mokhtarzadeh's concerns proved true. Four years after Plaintiff's imprisonment, he still continues to struggle with severe symptoms. His treating psychologist and psychiatrist indicated his continued PTSD diagnosis was directly related to his torture while detained in Iran, and he continues to suffer severe symptoms of flashbacks, nightmares, insomnia, depression, anxiety, panic attacks, poor focus and concentration, and extreme agitation and rage.[4] He has been prescribed a range of psychotropic medication to treat this diagnosis as part of his treatment for this diagnosis, but his diagnosis is a lifetime syndrome with symptoms that will require treatment for the foreseeable future.[5] He has sought mental health treatment since he fled Iran, and his treating doctors stated that he will most certainly require continued treatment due to his ongoing severe symptoms.[6] Even after more than four years of treatment, Plaintiff's PTSD and depression show no signs of abating.

Plaintiff described his condition unbearable, "The torture and mistreatment have had a lasting impact on my physical and mental health. I suffer from chronic shoulder pain due to the severe cuffing, recurring infections in my ankles, and complications from untreated diabetes. Psychologically, I continue to experience severe anxiety, depression, and post-traumatic stress

---

[3] *See* Exhibit 2, Doctor's Note from Dr. A. Mokhtarzadeh, p. 1.
[4] *See* Exhibit 4, Doctor's Note from Dr. James Gracer, M.D. & Dr. Mona Afary, Ph.D., p. 1.
[5] *See* Exhibit 4, Doctor's Note from Dr. James Gracer, M.D. & Mona Afary, Ph.D., p. 2.
[6] *See* Exhibit 4, Doctor's Note from Dr. James Gracer, M.D. & Mona Afary, Ph.D., p. 2.

disorder (PTSD)"[7] , "The untreated diabetes during my detention led to the amputation of three toes on my right foot, causing chronic pain and mobility issues. Subsequently, due to complications arising from the untreated injuries and infections, I had to undergo the amputation of my right leg below the knee. This has resulted in a significant loss of mobility and independence, requiring me to use a prosthetic limb and rely on assistance for many daily activities."[8] Further, he described his current condition as: "Living under these conditions has placed an immense burden on my daily life. Simple tasks like walking, cooking, or even showering can be excruciatingly painful and exhausting. The constant need for medical care and the emotional toll of my experiences have left me feeling isolated and overwhelmed. The financial strain from unpaid medical bills and the inability to work consistently exacerbate my stress and anxiety, making it difficult to envision a stable future."[9]

### ii. _Permanent & Increasing Physical Injury_

Due to his torture and lack of medical attention during his imprisonment, Plaintiff also suffers permanent physical injury. Plaintiff suffers persistent and extreme shoulder, arm, and back pain from the method of handcuffing utilized.[10] Additionally, Plaintiff's feet were often handcuffed together so tightly that they frequently bled and Plaintiff's right foot because infected due to this injury. After his release, Plaintiff was evaluated by a psychiatrist who noted that the damage caused to his feet and ankles was apparent and visibly affected Plaintiff's mobility.[11]

---

[7] See Exhibit 18, Plaintiff's Supplemental Declaration, p. 5.
[8] _See Id_. P. 6.
[9] _See Id_. P. 9.
[10] _See_ Exhibit 1, Declaration of Akbar Lakestani, ¶ 35; Exhibit 7, Medical Records from Doctors Medical Center of Modesto (9/29/2022–10/5/2022), p. 1, 33, 43, 69, 72; Exhibit 10, Medical Records from Doctors Medical Center of Modesto (3/2/2023–3/16/2023), p. 83.
[11] _See_ Exhibit 2, Doctor's Note from Dr. A. Mokhtarzadeh, M.D.

He also has sustained damage to his eyes and kidneys as a result of his mistreatment, stress, high blood sugar, and lack of treatment for his diabetes.[12] From the prison guards' denial of his medication, Plaintiff's diabetes was poorly controlled during his detention and has caused continuing problems.[13] Immediately upon his release, he was referred to an endocrinologist to treat the poorly controlled diabetes and has continued to suffer with symptoms related to poorly controlled diabetes, such as the damage to his eyes and kidney disease. Since then, Plaintiff has been diagnosed and treated with eye and kidney problems that did not exist before his imprisonment.

Beyond the direct injuries incurred by his torture and lack of medical attention, Plaintiff has continued to sustain permanent injuries as a result of the medical complications caused by his treatment. Since his release, Plaintiff has been diagnosed with Cellulitis causing Plaintiff to perpetually battle against chronic foot ulcers and infection.[14] While the condition is related to his diabetes, Plaintiff's doctors have identified the injuries to his foot and ankles while imprisoned as having caused this condition. Dr. Woltebreek, who performed Plaintiff's first amputation procedure, noted that the wounds caused from the ankle shackles caused gait abnormality that

---

[12] *See* Exhibit 5, Medical Records from Central Valley Eye Medical Group, p. 6, 7, 14–16, 21–23, 31–33, 42; Exhibit 6, Medical Records from Doctors Medical Center of Modesto (9/18/2022– 9/19/2022), p. 2, 3, 22, 26; Exhibit 7, Medical Records from Doctors Medical Center of Modesto (9/29/2022–10/5/2022) p. 1, 2, 3, 6, 9, 32, 34, 36, 40, 45, 69, 72; Exhibit 9, Medical Records from Doctors Medical Center of Modesto (12/21/2022–12/25/2022), p. 1, 5, 31, 34; Exhibit 10, Doctors Medical Center of Modesto Medical Records (3/2/2023 – 3/16/2023), p. 5, 7, 13, 95, 73, 95, 99; Exhibit 11, Doctors Medical Center of Modesto Medical Records (5/9/2023 –5/19/2023), p. 2; Exhibit 14, Continuity of Care Records from Sunrise Hospital and Medical Center (1/23/2024), p. 9–10, 36–37; Exhibit 15, Visit Summary Records from Sunrise Hospital and Medical Center (1/23/2024), p. 3, 13–14.
[13] *See* Exhibit 2, Doctor's Note from Dr. A. Mokhtarzadeh, M.D.
[14] *See* Exhibit 8, Medical Records from Doctors Medical Center of Modesto (12/17/2022), p. 1, 3, 4, 11, 13, 14, 17, 22 (infected wounds to right foot, particularly 1st, 3rd, and 4th toes); Exhibit 9, Medical Records from Doctors Medical Center of Modesto (12/21/2022–12/25/2022), p. 5, 8, 10, 13, 30, 32, 33,34, 39, 44, 45, 46, 49, 50, 56, 57, 58 (noting extensive cellulitic damage on 1st, 2nd, and 3rd digits); Exhibit 10, Medical Records from Doctors Medical Center of Modesto (3/2/2023 – 3/16/2023), p. 1, 5, 6, 7, 13, 66, 71, 72, 73, 83, 95, 99; Exhibit 11, Medical Records from Doctors Medical Center of Modesto (5/9/2023 – 5/19/2023), p. 1, 9, 38, 41, 42, 43, 44, 49, 50 (three other toes too), 61, 70 (noting chronic infection and three additional toes affected); Exhibit 12, Medical Records from Valley Orthopedic (3/02/2023–5/22/2023), p. 8, 9, 11, 12, 19, 36.

advanced Plaintiff's foot problems.[15] Dr. Casey Burchill, who is overseeing Plaintiff's rehabilitation, also stated that Plaintiff's condition was caused by his treatment and Defendant's denial of medical attention to both Plaintiff's feet and diabetic medication.[16]

These infections have forced Plaintiff to be repeatedly hospitalized, and one occasion was so severe that the Plaintiff was hospitalized for two and a half weeks as he battled severe sepsis caused by the infection.[17] One infection was so persistent that Plaintiff's doctors informed him that he may eventually have to consider amputation, but Plaintiff understandably resisted.[18] However, he kept struggling with repeated and persistent infections to his right foot so much so that the infection has also spread to his bone (osteomyelitis).[19] So, in May of 2023, Plaintiff was forced to go undergo an amputation of the large toe on his right foot.[20] Contrary to Plaintiff's hopes, Plaintiff was again hospitalized for another infection to additional toes on his right foot.[21] Even after another amputations resulting in the removal of additional toes on his right foot, Plaintiff continued battling infections on his left foot.[22] Through 2024, Plaintiff had numerous hospital visits to treat his medical conditions and at least two separate amputation procedures. With increasing infections to his left foot, Plaintiff also fears having to amputate parts of his left foot as well.

---

[15] *See* Exhibit 12, Medical Records from Valley Orthopedics, p. 4, 5.

[16] *See* Exhibit 3, Doctor's Letter from Dr. Casey Burchill, MDP, FACFAS. Also See Exhibit 18. P.6.

[17] *See* Exhibit 10, Medical Records from Doctors Medical Center of Modesto (3/2/2023–3/16/2023), p. 1, 5, 6, 7, 13, 73, 95, 99.

[18] *See* Exhibit 10, Medical Records from Doctors Medical Center of Modesto (3/2/2023–3/16/2023), p. 66.

[19] *See* Exhibit 10, Medical Records from Doctors Medical Center of Modesto (3/2/2023–3/16/2023), p. 5, 7, 11, 13, 66, 71, 73, 95, 99, 106, 107; Exhibit 11, Medical Records from Doctors Medical Center of Modesto (5/9/2023 – 5/19/2023), p. 1, 4 6-7, 7, 9, 41, 43, 44, 45, 58, 61, 70; Exhibit 12, Medical Records from Valley Orthopedics (3/02/2023–5/22/2023), p. 5, 9, 16, 19, 26, 36.

[20] *See* Exhibit 11, Medical Records from Doctors Medical Center of Modesto (5/9/2023 – 5/19/2023), p. 7; Exhibit 12, Medical Records from Valley Orthopedics (3/02/2023–5/22/2023), p. 4, 16, 34, 36; Exhibit 11, Medical Records from Doctors Medical Center of Modesto (5/9/2023-5/19/2023), p. 38, 41, 42, 85.

[21] *See* Exhibit 15, Visit Summary Records from Sunrise Hospital and Medical Center (1/23/2024), p. 3.

[22] *See* Exhibit 12, Medical Records from Valley Orthopedics (3/02/2023–5/22/2023), p. 9, 11; Exhibit 15, Visit Summary Records from Sunrise Hospital and Medical Center (1/23/2024), p.13–14.

Plaintiff's medical complications have resulted in countless doctor and hospital visits and have accrued enormous medical costs. From 2021 to January 2024, Plaintiff's procedures were billed for over $1,101,451.23. This does not include Plaintiff's most recent procedures in February 2024, nor does it include the rehabilitative therapy necessary for Plaintiff to relearn movement and mobility without his toes. This sum reflects both the quantity of medical treatments required by Plaintiff as well as the extreme nature of medical intervention required for many of Plaintiff's procedures.



*Figure 1. Mr. Lakestani's right foot. See more at Exhibit 19, Lakestani's Pictures.*

Plaintiff must also learn a new way of life in treating and caring for himself so as to try to prevent future infections. More importantly, he must also learn how to navigate the physical aspects of life as an amputee with the constant mental burden and fear of future degradation of his physical state.

### iii.   *Quantum of Post- Captivity IIED*

An award of $10 million for post-captivity IIED is a reasonable estimate for Plaintiff's pain and suffering because it follows prior awards in similar cases. *See Amirentezam v. Islamic*

*Republic of Iran*, 1:19-cv-02066 (EGS/GMH), 2023 U.S. Dist. LEXIS 156689, at *71 (D.D.C. Sept. 5. 2023) (finding that a reasonable estimate can be determined by similar cases). Plaintiffs bringing claims under the FSIA are routinely awarded damages for pain and suffering experienced after release from captivity. This has been granted in lump-sum awards of $10 million in cases similar to Plaintiff's based on the extent of the plaintiffs' suffering of long-term injuries for the remaining life expectancy upon release. *See Hekmati v. Islamic Repub. of Iran*, 278 F. Supp. 3d. 145, 164 (D.D.C. 2017); *Rezaian v. Islamic Repub. of Iran*, 422 F. Supp. 3d 164, 180 (D.D.C. 2019); *see also Abedini v. Government of Islamic Republic of Iran*, 422 F. Supp, 3d 118, (D.D.C. 2019) (using $10 million as the starting point for IIED non-economic compensation and adjusting up or down based on factual circumstances); *Azadeh v. Government of the Islamic Republic of Iran*, No. 1:16-cv-1467 (KBJ), 2018 U.S. Dist. LEXIS 150597, *61 (D.D.C. Sept. 5, 2018) (using $10 million lump sum award as starting point, finding the factual circumstances most mirrored Hekmati which used $10 million baseline).

Plaintiff's treatment and injuries are similar enough to *Hekmati*, *Azadeh*, and *Rezaian* to warrant a $10 million baseline award, and where the cases do differ factually does not warrant a downward departure. Similar to the Plaintiff here, the plaintiff in *Hekmati* was held in a small solitary confinement cell in Evin Prison, enduring interrogations intended to elicit false confessions that consisted of psychological and extreme physical abuse, including prolonged stress positions causing permanent physical injury. *See Hekmati*, 278 F. Supp. 3d at 151–53. The *Hekmati* plaintiff was involuntarily drugged, sentenced in a sham trial and threatened with execution if the plaintiff did not issue a false confession. *Id.* The plaintiff in *Rezaian* was also held in solitary confinement in Evin Prison while interrogated with severe physical abuse, personal threats of execution, and threats toward family members. *See Rezaian*, 422 F. Supp. 3d

at 171–72. In *Rezaian*, the plaintiff was also denied his blood pressure medication for a long-standing medical issue with high blood pressure, and this resulted in pulmonary and respiratory issues upon release. *Id.* at 172. Likewise, *Azadeh* involved a plaintiff who endured solitary confinement, interrogations, false charges and sentencing at trial, conducting mock executions, threats of rape, forced drugging and sedating, physical beatings including getting pushed down the stairs, and denial of medical treatment. *See Azadeh*, 2018 U.S. Dist. LEXIS 150597, at * 12–22, 57. The plaintiff also conducted a hunger strike, for which she was taken to the hospital and given a sugar drip to prevent her strike. *Id.* at 22.

As demonstrated above, Plaintiff suffered similar treatment to the plaintiffs of *Hekmati*, *Rezaian*, and *Abedini*. All plaintiffs involved were subjected to extended solitary confinement, severe beatings and interrogations relating to false charges, threats of execution, threats of harm to loved ones, forced drugging, deprivation of medical treatment and/or medication, all of which caused extreme physical and psychological damage.

The main differences between these cases and Plaintiff's are his remaining life expectancy upon release and his deterioration of medical condition. In 2019, Plaintiff was 50 years old and had a life expectancy of 29.9 years upon release.[23] While this is not as long as plaintiffs in other cases, the awards were not based solely on age and life expectancy, but also the extent of long-term pain and suffering over that amount of time. *See Rezaian*, 422 F. Supp. 3d at 180; *Hekmati*, 278 F. Supp. 3d at 164. *Azadeh's* award departed entirely upon life expectancy as the pain and suffering between *Hekmati* and *Azadeh* were very similar, both during detention and after. *See Azadeh*, 2018 U.S. Dist. LEXIS 150597, at * 61–62. Conversely,

---

[23] *See* Exhibit 16, National Vitality Statistics Report, United States Life Tables, 2019, Table 17 (Life Table for non-Hispanic White Males: United States 2019), "National Vital Statistics Reports," Vol. 70, No. 19, Mar. 22, 2022, https://www.cdc.gov/nchs/data/nvsr/nvsr70/nvsr70-19.pdf.

the court in *Frost v. Islamic Republic of Iran* found that even though Mr. Frost passed away 21 months after being released from captivity, he was awarded $5 million for post-release pain and suffering due to the extent that he suffered in those 21 months. *See Frost*, 2019 U.S. Dist. LEXIS 179750, at *100.

After his release and subsequent escape from Iran, Plaintiff has continued to suffer extensively from PTSD and depression, like the other plaintiffs. However, because of Plaintiff's constantly deteriorating health and physical conditions, his post-release suffering sets him apart from *Azadeh*, *Hekmati*, and *Rezaian* because it is constantly getting worse rather than a relatively stagnant level with no newly acquired injuries. Plaintiff is continually acquiring new and severe injuries directly related to his treatment in Iran. Since Plaintiff has returned from Iran, he has undergone the amputation of three of his toes on his right foot, endured two separate extended stays in the hospital for sepsis, and is now experiencing infections to his left foot. His condition rapidly deteriorated and it is likely he will have to undergo continual treatment for his persistent infections, if not additional amputation procedures. This is considerably more extreme than just suffering lingering pain from past injuries as Plaintiff is actively acquiring more 'injuries' and greater physical harm as a result of his past torture. Plaintiff's continually amplifying pain and suffering is great enough to warrant $10 million for the remainder of his life despite having a shorter life expectancy than plaintiffs in *Azaden*, *Hekmati*, and *Rezaian*.

## 2. PAST ECONOMIC DAMAGES

In his Motion for Default Judgment, Plaintiff reserved the right to raise claims for economic damages based on the circumstances arising prior to the resolution of this suit. At this time, Plaintiff asserts past economic damages for medical expenses incurred from treatment related to Plaintiff's injuries.

### a. Legal Standard

As a victim of torture at the hands of a designated sponsor of state terrorism, caused by a foreign state or its officials, employees or agents in their official capacity, Plaintiff brings his claim under 28 U.S.C. 1605A, which creates a private right of action that allows plaintiffs to seek economic damages as a result of their torture. 28 U.S.C. §1605A(c).

Foreign state-sponsors of terrorism are liable for the economic damages incurred as a result of injuries or death caused by the foreign state's conduct, which can include wage loss, loss of earning capacity, pain and suffering, loss of property, and specifically, medical expenses. *Tracy v. Islamic Republic of Iran*, Civ. No. 01-2517 TFH 2003 U.S. Dist. LEXIS 15844, \*27–28 (D.D.C. Aug. 21, 2003). Courts have routinely awarded economic damages to torture victims in FSIA cases and have acknowledged medical expenses as compensable under the FSIA's 'economic damages' provision. *See Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 11–12 (D.D.C. 2001) (listing medical expenses under all the economic claims the plaintiff could have but did not make); *Campuzano v. Islamic Republic of Iran*, 2003 U.S. Dist. LEXIS 15963, \*38–39 (D.D.C. Sept. 3, 2003). The damages considered can include both past and future medical expenses. *See Levinson v. Islamic Republic of Iran*, No. 1:17-cv-00511 (TJK) 2020 U.S. Dist. LEXIS 251129, \*32 (D.D.C. July 16, 2020) (internal citations omitted). As a part of economic damages, past and future medical expenses are to be awarded where the plaintiff can demonstrate the consequences of defendants' conduct were reasonably certain to occur and the damages are proven by a reasonable estimate. *Levinson v. Islamic Republic of Iran*, No. 1:17-cv-00511 (TJK) 2020 U.S. Dist. LEXIS 251129, \*32 (D.D.C. July 16, 2020) (internal citations omitted).

### b. Plaintiff is Entitled to Economic Damages for Past Medical Expenses

Plaintiff has incurred substantial medical expenses while seeking treatment for injuries caused while detained in Iran and is permitted to recover economic damage in that amount. To receive past economic damages from medical expenses, plaintiffs must "prove the fact of injury with reasonable certainty," *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997), and "reasonably prove" the amount of those damages. *Hill*, 328 F.3d at 684. *See also Levinson*, 2020 U.S. Dist. LEXIS 251129, *33. As a threshold matter, plaintiffs must demonstrate that, beyond the fact of injury, the defendant is liable for the injury itself, namely that defendant's conduct caused the injury. *See Abedini v. Gov't of the Islamic Republic of Iran*, 422 F. Supp. 3d 118, 129–130 (D.D.C. 2019).

### i. *It is reasonably certain that Plaintiff was tortured by defendant*.

To recover past medical expenses, plaintiffs must prove the fact of injury with reasonable certainty. They may prove the fact of injury by affidavit or declaration, and the factfinder may accept a plaintiff's evidence as true when uncontroverted. *See Levinson v. Islamic Republic of Iran*, No. 1:17-cv-00511 (TJK) 2020 U.S. Dist. LEXIS 251129, *32 (D.D.C. July 16, 2020) (citing *Lanny J. Davis & Associates LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 161 (D.D.C. 2013)). As state sponsors of terrorism traditionally make all efforts to erase any evidence, courts have repeatedly relied on the uncontroverted affidavits or declarations of FSIA plaintiffs. *See, e.g.*, *Levinson*, 2020 U.S. Dist. LEXIS 251129, at *33 (citing to judicial history of relying on plaintiffs' affidavits or declarations when determining the proof of claims).

Throughout his confinement, Plaintiff endured repeated beatings and physical abuse. Plaintiff was routinely kept handcuffed and shackled so tightly it caused bleeding and infection, and he was routinely beaten while in handcuffed positions. Plaintiff's right foot became so infected due to being handcuffed to his medical bed that he feared it would need to be amputated.

He was repeatedly denied medical treatment for his injuries and was refused medication to treat his diabetes. As a result, he suffered severe medical ailments and was eventually hospitalized. He was psychologically tormented through taunts about his impending death multiple times, violent threats aimed toward his wife and children, and he was held in confinement with violent criminals that caused further stress on his feelings of insecurity.[24]

<em>ii. <u>Reasonably prove the torture caused the injuries requiring treatment.</u></em>

As a threshold question, Plaintiff's injuries must be a result of Defendant's unlawful conduct. In addition to proving the fact of injury and the extent of the medical damages, plaintiffs must prove that the costs are the result of Iran's unlawful conduct, and therefore, that the injuries are directly caused by Iran's unlawful conduct. *See Khosravi*, No. 1:16-cv-02066-TSC, 2020 U.S. Dist. LEXIS 152062, *17 (D.D.C. Aug. 21, 2020); *see also Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 230 (D.D.C. 2012) (requiring 'reasonable connection' between cancer diagnosis and torture). Seemingly natural progression of medical conditions, or exacerbation of a pre-existing medical condition, has been considered as being sufficient as having 'caused' the injuries. The injury need not be a direct, 'but-for' causation, but rather that the injuries sustained during captivity were a contributing cause to the injuries alleged. *See Frost v. Islamic Republic of Iran*, No. 17-cv-603 (TJK), 2019 U.S. Dist. LEXIS 179750, *74; *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010); *see also Hill*, 328 F.3d at 685 (although court remanded for inconsistent calculation of damages, it did not touch finding that diabetes was exacerbated by poor medical treatment).

Plaintiff has several residual medical challenges caused by or exacerbated by his treatment while detained. In prison, Plaintiff was continually denied medical treatment for his

---

[24]Exhibit 1, Declaration of Akbar Lakestani, ¶¶18–20.

injuries and medication required to treat his diabetes.[25] Plaintiff experienced severe medical complications that required his hospitalization on multiple occasions.[26] He was cuffed in stress positions so tightly that his ankles bled and became infected. Since his release, Plaintiff has struggled with chronic wounds and ulcers to his feet frequently get infected. Plaintiff has since been diagnosed with a severe case of cellulitis and has continued to struggle with infections, leading to multiple hospitalizations, at one point for nearly two weeks with a severe case of sepsis caused by this condition, and has required two separate amputations due to chronic infection and osteomyelitis (bone infection), and suffered complications from his second amputation.[27]

Plaintiff's advanced cellulitis required the amputation of multiple toes on his right foot. Plaintiff's treating physicians have agreed that his current medical complications and injuries were incurred and exacerbated by his torture and detention by Iran. The doctor performing Plaintiff's amputation concluded the damage caused to Plaintiff's right foot during detention has impacted the way Plaintiff walks and moves and advanced his condition of cellulitis.[28] The physician providing follow-up care and rehabilitation treatment after plaintiff's amputation concluded the same.[29]

> ### iii. _Reasonably Prove the Amount of Medical Expenses Incurred_

Plaintiffs seeking recovery must reasonably prove the amount of past economic damages. Due to the easily documentable nature of medical expenses, plaintiffs must provide clear evidence of expenses incurred. _See Wyatt v. Syrian Arab Republic_, 908 F. Supp. 2d 216, 230

---

[25] Exhibit 1, Declaration of Akbar Lakestani, ¶¶ 9, 13, 17, 20,
[26] Exhibit 1, Declaration of Akbar Lakestani, ¶¶ 9, 17, 20–21, 25–28.
[27] _See supra_ at note 13 (medical records documenting sepsis), note 11 (medical records documenting cellulitis), note 16 (medical records documenting osteomyelitis/bone infection), note 17 (medical records documenting amputation); _see_ Exhibit 15, Visit Summary Records from Sunrise Hospital and Medical Center (1/23/2024), p. 3.
[28] _See_ Exhibit 12, Medical Records from Valley Orthopedics (3/02/2023–5/22/2023), p. 5.
[29] _See_ Exhibit 3, Doctor's Note from Dr. Casey Burchill, PMD, FACFAS.

(D.D.C. 2012) (requiring evidence of what costs specifically were incurred); *see also Khosravi*, 2020 U.S. Dist. LEXIS 152062, at *17 (awarding medical damages where the plaintiff provided evidence of the exact dollar amount of past medical expenses). Courts in this jurisdiction have noted that medical expenses are not hard to quantify with competent evidence and acknowledged that providing medical bills or payment records is sufficient for establishing an estimate. *See Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 71 (D.D.C. 2015); *Mustard v. Islamic Republic of Iran*, No. 21-cv-163(BAH), 2023 U.S. Dist. LEXIS 19748, *30 n.13 (D.D.C. Feb. 6, 2023) (listing medical bills or payments as legitimate means to prove the amount of medical expenses by a reasonable estimate).

As such, Plaintiff has provided extensive medical documentation of bills and payments providing the exact medical costs and expenses. Plaintiff's procedures incurred over $1,101,451.23 in medical expenses for repeated treatments of wounds and infections caused by treating cellulitis on both feet, with $81,846.78 coming due.[30] These charges have occurred exclusively over the past three years since 2021. As the past expenses are clearly documented through the provided medical billing documentation, Plaintiff has reasonably proven the amount of past economic damages in the form of medical expenses incurred since fleeing Iran's imprisonment.

## CONCLUSION

Plaintiff has demonstrated past and future economic damages in the form of medical expenses as a direct and foreseeable result of Plaintiff's torture during his detention in Iran. Plaintiff has proven with certainty that he was tortured at the hands of the IRGC and established his past medical expenses with reasonable certainty. Plaintiff has demonstrated that the projected

---

[30] *See* Exhibit 17, Medical Expenses.

consequences of his medical conditions are reasonably certain to occur and has proven those amounts by a reasonable estimate.

Accordingly, Plaintiff respectfully requests this Court award the following economic damages:

**A.  Total Damages Award: $10,551,846.78**

    1.  Non-Economic Damages: $10,470,000

    2.  Past Economic Damages: $81,846.78

Respectfully submitted,

Ali Herischi, Esq.  (MD0024)
Herischi & Associates, LLC
11300 Rockville Pike, Ste 712
North Bethesda, MD 20852
(301) 363-4540 (Main)
Ali.Herischi@ibhlaw.com
*Counsel for Plaintiff*