## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AKBAR LAKESTANI,

                    Plaintiff,

      v.

ISLAMIC REPUBLIC OF IRAN, *et al.*,

                Defendants.

Case No. 21-cv-2232 (JMC)

## <u>MEMORANDUM OPINION</u>

Plaintiff Akbar Lakestani alleges that he suffered severe personal injuries and other irreparable harm while detained in the Islamic Republic of Iran (Iran) by the Islamic Revolutionary Guard Corps (IRGC), an Iranian military organization under the control of Iran's Supreme Leader, Ali Hosseini Khamenei. *See generally* ECF 1.[1] As a result, Mr. Lakestani filed this suit under the Foreign Sovereign Immunity Act (FSIA), 28 U.S.C. §§ 1602 *et seq.*, against Iran, Supreme Leader Hosseini Khamenei, the IRGC, and the IRGC's then-Commander-in-Chief Hossein Salami, ECF 1.

Mr. Lakestani served Defendants, and they failed to appear or respond. *See* ECF 12; ECF 17. The Clerk of Court entered default against Defendants. ECF 20. Mr. Lakestani now moves for default judgment against Defendant Iran, alone. ECF 19 at 1.[2] Mr. Lakestani requests

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

[2] Although the Clerk of Court entered default as to all Defendants, Mr. Lakestani has only moved for default judgment against Defendant Iran. *See* ECF 19 at 1 ("Plaintiff now proceeds in this action . . . against Defendant Iran alone."). As a result, the Court shall not address Mr. Lakestani's claim under the Torture Victims Protection Act against Ali Hosseini Khamenei or Hossein Salami. *See Alinejad v. Islamic Republic of Iran*, No. 19-cv-3599 (GMH), 2023 WL

compensatory damages, including for pain and suffering and economic damages. He also requests punitive damages.

Finding that the prerequisites for default are met and that Mr. Lakestani states a claim under the FSIA's terrorism exception, the Court will **GRANT** Mr. Lakestani's motion for default judgment. The Court will award Mr. Lakestani pain and suffering, economic, and punitive damages, although not in the amounts he seeks. For the reasons explained below, the Court enters default judgment in the amount of $14,233,204.88.

## I.    BACKGROUND

### A.    Factual Background[3]

Mr. Lakestani is a dual national Iranian-American journalist and human rights activist. ECF 19-3 ¶¶ 1, 4. Born and raised in Iran, Mr. Lakestani has been a vocal critic of the Iranian regime. *Id.* ¶¶ 1–3; ECF 23-18 ¶ 1. In 2007, he was arrested by the Iranian government in connection with his activism and charged with "insulting . . . regime officials" and "advocacy against the regime." ECF 19-3 ¶ 3. Mr. Lakestani was sentenced to three years in prison, and ultimately left Iran in 2009 due to pressures from the Iranian intelligence services. *Id.* Mr. Lakestani became a United States citizen in March 2018 and has continued to speak out against the Iranian government. *Id.* ¶ 4. He has diabetes and high blood pressure and requires medication for both conditions. *Id.* ¶¶ 9, 13, 27.

On September 28, 2019, Mr. Lakestani travelled to Iran to visit his ailing mother. ECF 19-3 ¶ 5. When he entered the country, he was detained by armed men who identified themselves as

---

4684929, at *1 n.3 (D.D.C. July 6, 2023); *see* ECF 1 ¶¶ 53–58. However, the IRGC is "not a separate legal person, but is a governmental entity," *Ben-Rafael v. Islamic Republic of Iran*, 718 F. Supp. 2d 25, 33 (D.D.C. 2010), and thus "must in all cases be considered as the foreign state itself," *Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 59 (D.D.C. 2019). As a result, any reference to Iran as a defendant in this opinion should be read to also include the IRGC.

[3] These facts are derived from Mr. Lakestani's declarations. *See* ECF 19-3; ECF 23-1; ECF 23-18.

IRGC officers. *Id.* ¶¶ 5–6. The officers tied Mr. Lakestani's hands behind his back, blindfolded him, and drove him to a detention center in an undisclosed location. *Id.* There, the officers accused Mr. Lakestani of being a spy for the United States and subjected him to protracted interrogations for two days. *Id.* ¶¶ 8, 10, 14. IRGC officers then took Mr. Lakestani to the Islamic Revolutionary Court where he was interrogated by a Deputy Prosecutor and two plainclothes officers who told him they were from the IRGC. *Id.* ¶ 11. The Deputy Prosecutor removed Mr. Lakestani's case to the prosecutor's office in Urmia. *Id.* Mr. Lakestani was then informed that he would be transferred to the Central Prison of Urmia and handed over to IRGC intelligence agents. *Id.*

On October 3, 2019, Mr. Lakestani was transferred to the Central Prison of Urmia, handed over to IRGC officers, and detained in the IRGC intelligence section of the prison. ECF 19-3 ¶ 12. The officers interrogated Mr. Lakestani about his alleged spying, warned him that failure to comply could result in him receiving the death penalty, and threatened sexual violence against his children. *Id.* ¶¶ 12–15. These interrogations carried on for several days and frequently lasted more than twelve hours. *Id.* ¶ 16–17. While detained in the Central Prison, Mr. Lakestani was beaten and denied access to his necessary diabetes and blood pressure medication. *Id.* ¶ 13, 15, 17. His feet bled so badly that they stained the carpet of his cell. *Id.* ¶ 17. A prison doctor informed the prison guards that Mr. Lakestani may "have a stroke and die at any moment" if not provided medication and immediate treatment, but he was nevertheless denied access to his medication. *Id.* ¶ 17.

While Mr. Lakestani was detained in the Central Prison of Urmia, the Revolutionary Prosecutor charged him with "cooperating with anti-regime groups," "propaganda against the regime" and "insulting the Supreme Leader." ECF 19-3 ¶ 18. His bail was set at 300 million tomans (at the time, approximately $30,000 USD) for his temporary release pending court

proceedings, which he and his family could not pay. *Id.* As a result, Mr. Lakestani remained in the Central Prison and suffered continued abuses and feared for his life. *Id.* ¶ 19. On October 19, 2019, he began a fourteen-day hunger strike to secure medical treatment, including his necessary medications, and safer conditions. *Id.* ¶ 20. He was threatened when he refused to end the hunger strike and marched out to see the prison yard where executions were performed. *Id.* When Mr. Lakestani's hunger strike ended his health deteriorated, and he was transported to Khomeini State Hospital and given an injection of glucose. *Id.* ¶ 21. However, while Mr. Lakestani was shackled to his hospital bed, the prison guards beat him with their guns to punish him for calling for help. *Id.* ¶ 21. They subsequently injected him with an unknown substance and he fell unconscious. *Id.*

Mr. Lakestani woke up in the hospital's detention center, where conditions were even worse than in the Central Prison of Urmia. ECF 19-3 ¶ 22. He was kept in a filthy room without windows or ventilation. *Id.* The guards beat him every day and berated him for being a traitor and a spy. *Id.* When other patients beat and sexually assaulted Mr. Lakestani, the guards ignored his cries for help or beat him for making too much noise. *Id.* Throughout his time in the hospital's detention center, Mr. Lakestani's hands and ankles were tightly bound to the bed and he was unable to move. *Id.* ¶ 23–24. Interrogators told him that if he wanted to end his suffering, he should confess to his crimes of espionage. *Id.* On November 6, 2019, Mr. Lakestani was transferred to the Razi Psychiatric hospital, where he was detained with extremely violent patients, forced to take unknown medications, and beaten while bound. *Id.* ¶ 25–27. His binding caused severe pain in his shoulders, and the shackling of his legs caused Mr. Lakestani's ankles to bleed and develop an infection. *Id.* ¶ 27. He was temporarily transferred to the Taleghani Hospital in Urmia, but was not provided treatment, and was then moved back to the Central Prison of Urmia. *Id.* ¶ 28.

On November 13, 2019, after 47 days of detention, Mr. Lakestani's "jailers finally agreed to accept bail from [his] family." ECF 19-3 ¶¶ 29–30. Mr. Lakestani was temporarily released on the condition that he go to the prosecutor's office regularly for interrogation. *Id.* ¶ 30. During his temporary release, he was called back for more interrogations—three with the Urmian Revolutionary Court, two with the prosecutor's office, and one more with the Ministry of Intelligence after the death of General Qasem Soleimani in a U.S. airstrike. *Id.* ¶ 32. During the interrogation following Soleimani's death, the interrogators pressured Mr. Lakestani to write an article condemning U.S. government's actions, and told Mr. Lakestani that it would be helpful to his case if he did so. *Id.* Mr. Lakestani refused and, on February 9, 2020, fled Iran through the Turkish border and ultimately traveled back to the United States. *Id.* ¶¶ 32–33.

Upon returning to the United States, Mr. Lakestani received medical treatment for the injuries stemming from his detention, but still suffers from persistent pain, post-traumatic stress, anxiety, depression, and permanent damage to his eyes and legs. ECF 19-3 ¶ 35; ECF 19-4 ¶ 7. Notably, Mr. Lakestani has debilitating injuries because of Defendant's refusal to provide diabetes treatment during his detention. His untreated diabetes compromised his kidneys and necessitated that he amputate three of the toes on his right foot . ECF 23-18 ¶¶ 6, 8. Later, complications from his untreated injuries and infections required Mr. Lakestani to have his right leg amputated below the knee. *Id.* ¶ 6. In sum, Mr. Lakestani's persistent physical and mental suffering has severely impacted his quality of life by limiting his ability to work, perform daily functions, and maintain financial stability. *Id.* ¶¶ 8–9. He is overwhelmed by medical bills and finds it "difficult to envision a stable future." *Id.* ¶ 9.

### B.   Procedural History

Mr. Lakestani filed this action on August 23, 2021, against four defendants: Iran, Supreme Leader Hosseini Khamenei, the IRGC, and then-IRGC Commander-in-Chief Hossein Salami. *See generally* ECF 1. He seeks money damages for torture, assault and battery, false imprisonment, and intentional infliction of emotional distress under 28 U.S.C. § 1605A(c)'s private right of action against state sponsors of terrorism.[4]

He moved for service under 28 U.S.C. § 1608(a)(3), requesting that the Clerk of Court send one copy of the summons, complaint, and notice of suit, together with a translation of each into Farsi, by registered mail with return receipt requested to the head of Iran's Ministry of Foreign Affairs. ECF 5. The Clerk of Court mailed the documents to Iran on September 24, 2021, ECF 7; ECF 7-1, but service could not be made within the 30 days required by section 1608(a)(3) because the service package was rejected by Iran's Ministry of Foreign affairs and returned to Mr. Lakestani, ECF 8-1 at 1; ECF 17-1 ¶ 2. Mr. Lakestani then moved for service under 28 U.S.C. § 1608(a)(4), requesting that the Clerk of Court send copies of the aforementioned service documents to the U.S. Department of State. ECF 8. The Clerk of Court mailed the documents to the State Department on December 16, 2021, ECF 9, and the State Department confirmed that service was effected on Defendants through diplomatic channels in Tehran, Iran on June 15, 2022, ECF 12. Return of service was executed on August 8, 2022. *Id.*

Under 28 U.S.C. § 1608(d), Defendants were required to respond to the complaint within 60 days of service, on August 14, 2022. Defendants have failed to respond or appear in this case, so Mr. Lakestani moved for entry of default. ECF 17. The Clerk of Court entered default as to all

---

[4] Plaintiff's complaint discusses intentional infliction of emotional distress under the heading of a claim of "Solatium." For reasons discussed in Section III.C.3 below, the Court construes Plaintiff's solatium count as alleging the tort of intentional infliction of emotional distress.

Defendants. ECF 20. Mr. Lakestani now moves for the Court to enter default judgment against Defendant Iran, alone. ECF 19 at 1. Since moving for default, Mr. Lakestani has filed a supplemental brief and supporting exhibits on damages. ECF 23.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 55(b)(2), the Court may enter default judgment against an absent respondent when a petitioner applies for it. But "the entry of a default judgment is not automatic," *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005), particularly when the defaulting party is a foreign sovereign. Such cases are governed by the Foreign Sovereign Immunities Act (FSIA), which "affords the sole basis for obtaining jurisdiction over a foreign state in United States courts." *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13 (D.C. Cir. 2015); *see* 28 U.S.C. § 1604. Under the FSIA, foreign sovereigns are presumptively immune from suit unless certain statutory exceptions apply. *Mohammadi*, 782 F.3d at 13–14; 28 U.S.C §§ 1604, 1605. Accordingly, before entering a default judgment against a foreign state, the Court must satisfy itself that it has subject-matter jurisdiction over the claims (in other words, that a statutory exception to immunity applies) and personal jurisdiction over the respondent. *See, e.g.*, *Sterling Merch. Fin. Ltd. v. Republic of Cabo Verde*, 261 F. Supp. 3d 48, 50 (D.D.C. 2017). The moving party bears the burden of establishing the court's jurisdiction. *See, e.g.*, *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 190 (D.D.C. 2017).

Even after confirming its jurisdiction, a court cannot enter a default judgment against a foreign state unless the petitioner presents "a legally sufficient prima facie case, in other words, a legally sufficient evidentiary basis for a reasonable [fact-finder] to find for the plaintiff." *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 150 (D.D.C. 2010) (quoting *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 63 (D.D.C. 2008), *aff'd*, 646 F.3d 1 (D.C. Cir. 2011)). The FSIA

gives the court discretion to decide precisely how much and what kinds of evidence a petitioner must submit to establish its right to relief, "requiring only that it be 'satisfactory to the court.'" *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014) (quoting 28 U.S.C. § 1608(e)). And the FSIA "does not require the court to demand more or different evidence than it would ordinarily receive." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020). The "satisfactory" evidence standard "can be met through uncontroverted factual allegations supported by documentary and affidavit evidence." *Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 244 (D.D.C. 2020). An evidentiary hearing is not required. *Mwani*, 417 F.3d at 7. "To establish a prima facie case, plaintiffs are not limited to evidence that meets the standards of admissibility required by the district court. Rather, they may rest their argument on their pleadings, bolstered by" the documentary and affidavit evidence. *Id.* Overall, the FSIA "give[s] an unresponsive sovereign some protection against an unfounded default judgment," but it does not "relieve[] the sovereign from the duty to defend cases." *Owens*, 864 F.3d at 785.

## III.    ANALYSIS

The Court's analysis proceeds as follows. First, the Court will determine whether it has subject-matter jurisdiction under the FSIA's terrorism exception. Second, the Court will consider whether it has personal jurisdiction over Iran. Third, the Court will evaluate whether Mr. Lakestani has established liability under the FSIA's private right of action. Finally, the Court assesses Mr. Lakestani's requests for pain and suffering, economic, and punitive damages.

A.    **Subject-Matter Jurisdiction.**

Because Plaintiff sues a foreign state for torture, multiple sections of the FSIA and related statutes must be satisfied for this Court to possess subject-matter jurisdiction. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 64 (D.D.C. 2010). These requirements can be broken out into three core questions: whether the court has original jurisdiction under 28 U.S.C. § 1330(a); whether the foreign state has waived immunity under the FSIA's terrorism exception, 28 U.S.C. § 1605A(a)(1); and whether the FSIA requires that Plaintiff's claim be heard under 28 U.S.C. § 1605A(a)(2). The Court takes each question in turn and, each being satisfied, finds that it possesses subject-matter jurisdiction.

1.    ***The Court Possesses Original Jurisdiction if Iran Lacks Sovereign Immunity.***

Under the FSIA, federal district courts have "original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity." 28 U.S.C. § 1330(a); *see also* 28 U.S.C. § 1604 (foreign states are not immune where one of the exceptions to immunity in §§ 1605–07 applies). A foreign state is defined as any "political subdivision" or "agency or instrumentality," 28 U.S.C. § 1603(a), which includes Iran and the IRGC, *Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 59 (D.D.C. 2019) (finding both Iran and the IRGC to be "the foreign state itself"). Setting aside the question of Iran's immunity, Mr. Lakestani has satisfied the other factors necessary to establish this Court's original jurisdiction under § 1330(a). By seeking default judgment against Iran, he pursues a nonjury civil action against a foreign state. *See Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 210 (D.D.C. 2012) ("[A] default judgment proceeding under the FSIA is a nonjury civil action."). And, by suing Iran "as a legal person and not a suit against property," he seeks relief *in personam*. *Aykes v. Islamic Republic of Iran*, No. 18-

cv-0625 (RCL), 2020 WL 7260445, at *1 (D.D.C. Feb. 3, 2020) (defining "in personam" jurisdiction in suit against Iran). Thus, the Court need only resolve whether Iran possesses sovereign immunity to determine that it has original jurisdiction, and turns to that question next.

### 2. Iran Waived its Sovereign Immunity Under the FSIA's Terrorism Exception.

The FSIA grants foreign states immunity from suit in the United States unless some exception to immunity applies. *See, e.g.*, *Holladay v. Islamic Republic of Iran*, 523 F. Supp. 3d 100, 104 (D.D.C. 2021). As a foreign state, Iran is presumptively immune under the FSIA. *Valore*, 700 F. Supp. 2d at 65. Mr. Lakestani argues that the FSIA's terrorism exception, 28 U.S.C. § 1605A, deprives Iran of sovereign immunity. ECF 19 at 7–8. Under the FSIA's terrorism exception, a foreign state lacks immunity against suits in which the plaintiff alleges: (1) that the foreign state (2) committed "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or [provided] material support or resources for such an act if such act or provision of material support or resources . . . [was] engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency," (3) which "caused" (4) "personal injury or death" (5) for which "money damages are sought." 28 U.S.C. § 1605(A)(a)(1); *see also Valore,* 700 F. Supp. 2d at 66.

In this case, the first, fourth, and fifth elements are self-evident: Iran is plainly a foreign state, and Mr. Lakestani seeks money damages for alleged personal injuries incurred during his detention. ECF 1 ¶¶ 75. Mr. Lakestani argues that the remaining elements—whether Iran committed an act of terrorism, and whether that act caused Mr. Lakestani's alleged injuries—are satisfied because Iran tortured him while he was detained. ECF 19 at 8–22.[5] The Court agrees; Mr.

---

[5] Mr. Lakestani originally alleged that he was subject to both torture and hostage-taking, ECF 1 ¶¶ 45–52, but appears only to move for default based on the alleged acts of torture, ECF 19 at 11–21.

Lakestani has established, by evidence sufficient to the Court, that Iran caused his injuries by torturing him throughout his 47-day detention.

### a.  Iran Tortured Mr. Lakestani.

The FSIA defines torture as it is used in the Torture Victim Protection Act of 1991 (TVPA). *See* 28 U.S.C. § 1605A(h)(7) (citing 28 U.S.C. § 1350 note). As relevant here, the TVPA defines torture as:

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering . . . whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind[.]

TVPA, Pub. L. No. 102-256, § 3(b)(1), 106 Stat. 73 (1992) (as presented at 28 U.S.C. § 1350 note). To establish that Iran tortured him, Mr. Lakestani must show that Iran (1) "inflicted severe pain or suffering on [him]," (2) while he was in its "custody or physical control," and (3) the severe pain or suffering was inflicted "for a purpose such as obtaining information or a confession, punishing [him] or others, or intimidating or coercing" the United States, or others. *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 79 (D.D.C. 2018) (quoting TVPA § 3(b)). As described below, the Court finds that Mr. Lakestani has satisfied each of these factors and established that Iran tortured him.

**Iran Inflicted Severe Pain or Suffering on Mr. Lakestani:** The D.C. Circuit has stressed that only acts that are "sufficiently extreme and outrageous to warrant . . . universal condemnation" satisfy the definition of torture. *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 92–93 (D.C. Cir. 2002). The precise level of actual pain and suffering a defendant must inflict before their conduct rises to the level of torture is ambiguous. *Id.* at 92. But

in general, "[t]he more intense, lasting, or heinous the agony, the more likely [a given act] is to be torture." *Id.* at 93. So while "not every instance of excessive force used against prisoners[] is torture under the FSIA," *id.*, it is well recognized in this Circuit that "repeated beatings, threats, unsanitary conditions, and inadequate food and medical treatment in detention can meet this definition, both because these conditions are sufficiently severe, and because they support an inference of punishment for an illicit purpose." *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 45 (D.D.C. 2019) (citing *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 160–61 (D.D.C. 2017)). The Court has no trouble finding that this definition is satisfied here.

Mr. Lakestani suffered each of the indignities described in *Frost* and more. Prison guards beat him routinely, including one instance where they beat him with their guns while he was receiving emergency medical treatment. *See, e.g.*, ECF 19-3 ¶¶ 17, 21–22. Consistent with other cases in which Iran tortured detainees by withholding blood pressure medication and medical treatment, s*ee Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 171, 176–77 (D.D.C. 2019), IRGC officers and prison guards refused to provide Mr. Lakestani his necessary diabetes and blood pressure medication and provided him with inadequate medical care. ECF 19-3 ¶¶ 17, 20, 27. And, despite Mr. Lakestani's serious medical problems, the IRGC held him in squalid conditions without windows or ventilation, restrained him in painful positions for extended periods, and subjected him to continued physical violence. ECF 19-3 ¶¶ 22–24, 27; *see also Price*, 294 F.3d at 92–92 (torture includes "sustained systematic beating" and "tying up or hanging in positions that cause extreme pain"). In addition to the physical abuse, Mr. Lakestani was subjected to emotional terrorization. His captors threatened him with death and bodily harm on numerous occasions, and also threatened to harm and sexually abuse his family members. ECF 19-3 ¶¶ 14, 20.

Various courts in this district have held that conduct much like Iran's treatment of Mr. Lakestani is sufficiently severe to qualify as torture. *See e.g.*, *Rezaian*, 422 F. Supp. 3d at 177 (collecting cases); *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 68 (D.D.C. 2015) (finding torture when plaintiff was "frequently subjected . . . to severe physical and mental pain, including threatening him with death and dismemberment, physically beating him, . . . and keeping him in excruciatingly painful positions for hours at a time during the interrogations"); *Abedini v. Gov't of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 129 (D.D.C. 2019) (finding acts of torture when Iran "repeatedly beat, shocked, and whipped" detainee, kept him in "stress positions," with "no space to move," and "repeatedly denied medical treatment"); *Nikbin v. Islamic Republic of Iran*, 517 F. Supp. 2d 416, 425 (D.D.C. 2007) (holding that torture includes "sustained systematic beating . . . and tying up or hanging in positions that cause extreme pain"). Consistent with the caselaw in this jurisdiction, the Court concludes that the conditions of confinement and repeated abuse Mr. Lakestani suffered were acts of torture.

**Mr. Lakestani Was in Iran's Custody or Physical Control:** Heinous as they may be, intentional acts that cause extreme suffering do not qualify as torture unless they occurred while the victim was in the defendant's "custody or physical control." TVPA § 3(b)(1). Iran held Mr. Lakestani in prisons, detention centers, and hospitals for more than a month through force, threats, and physical restraint. *See supra* Section I.A. He was well within Iran's custody and physical control when IRGC officers and prison guards in IRGC-controlled facilities abused him.

**The Pain and Suffering was Purposive:** Finally, torture must be "purposive, and not merely haphazard." *Price*, 294 F.3d at 93; see also *Han Kim*, 774 F.3d at 1050 ("[S]uffering alone is insufficient to establish a claim under the FSIA's terrorism exception."). "Torture" under the TVPA and the FSIA must be "intentionally inflicted on that individual," TVPA § 3(b)(1), for one

of the purposes enumerated in the TVPA, such as to "punish him for his religious or political beliefs." *Han Kim*, 774 F.3d at 1050. Here, Mr. Lakestani has shown that the Iranian authorities intended to inflict severe pain and suffering on him for multiple reasons listed under the TVPA, including to "punish[]" him for his criticism of the regime and to "obtain . . . information or a confession" from him about the United States and his alleged acts of spying. *See* TVPA § 3(b)(1). The IRGC officers and prison guards were clear about their intentions. During their protracted interrogations, they questioned Mr. Lakestani about his political activism, accused him of spying for the United States, and pressured him to confess to espionage and to share details about other "traitors." ECF 19-3 ¶¶ 14, 16. Prison guards beat and spit on Mr. Lakestani because he was a "traitor" and "spy," *id.* ¶ 22, and officers told him that the only way to end his suffering was to confess, *id.* ¶¶22–23. The "depravity of the abuse" and the context in which it was inflicted indicates that the abuse Mr. Lakestani endured was not mere purposeless or random violence but directed torture with a clear and political end. *See Fritz*, 320 F. Supp. 3d at 81.

### b.  The Acts of Torture Were Official Acts.

An act of terrorism under the FSIA must have been performed by "an official, employee, or agent" acting "within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605(A)(a)(1). IRGC agents interrogated and abused Mr. Lakestani while he was detained and under their control in the Central Prison of Urmia, Khomeini State Hospital, and Razi Psychiatric Hospital. *See, e.g.*, *supra* Section I.A. As a political subdivision of Iran, the IRGC may be treated as Iran itself for the purposes of an action under the FSIA's terrorism exception. *Ben-Rafael*, 718 F. Supp. 2d at 32. Accordingly, and consistent with other cases in which IRGC officers detained and tortured plaintiffs in Iranian prisons, the Court finds that the IRGC officers who tortured Mr. Lakestani were acting on behalf of Iran and in their official capacity. *Azadeh v. Gov't*

*of Islamic Republic of Iran*, No. 1:16-cv-1467 (KBJ), 2018 WL 4232913, at *13 (D.D.C. Sept. 5, 2018) (finding that IRGC agents who detained plaintiff were acting in their official capacity on behalf of Iran); *see also Rezaian*, 422 F. Supp. 3d at 176.

### c. Iran's Torture Caused Mr. Lakestani's Injuries.

Finally, Mr. Lakestani must show that his injuries were "caused by" Iran's acts of torture. 28 U.S.C. § 1605A(a)(1). "[T]here is no 'but-for' causation requirement" for cases under the terrorism exception. *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 42 (D.D.C. 2009). Instead, a plaintiff need only show that the foreign state's act was the proximate cause of their injury. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004)). Proximate cause is established if the plaintiff shows "some reasonable connection" between the defendant's act and "the damages which the plaintiff has suffered." *Barry v. Islamic Republic of Iran*, 410 F. Supp. 3d 161, 174 (D.D.C. 2019). Mr. Lakestani alleges that he suffers from ongoing physical and psychological injury stemming from his abuse, including post-traumatic stress syndrome, depression, a sleep disorder, nightmares, and shoulder and spine pain related to the way the IRGC restrained him. ECF 1 ¶¶ 31, 51, 61, 67; ECF 19-3 ¶ 35. In his declaration, he also describes how his captors "cuffed [his] feet in such a way that caused [his] ankles to bleed and become severely infected," and that he needed to have his legs operated on following his release. ECF 19-3 ¶¶ 27, 35. He alleges that the denial of his diabetes and blood pressure medications that occurred while he was confined aggravated those illnesses and have led to further medical complications. *Id.* ¶¶ 17, 20, 35; ECF 23-18 ¶¶ 3, 6. There is more than a reasonable connection between these injuries and the abuse Mr. Lakestani endured while detained. Accordingly, Mr. Lakestani has sufficiently alleged causation and demonstrated that Iran tortured him.

\*    \*    \*

For these reasons, all elements of the FSIA's terrorism exception are met and the final element of § 1330(a) is satisfied. Accordingly, the Court possesses original jurisdiction over this matter.

### 3.  *The Court Must Hear Plaintiff's Claim.*

Even if a foreign state lacks immunity, a federal district court "shall hear a claim" under the terrorism exception only if the conditions under 28 U.S.C. § 1605A(a)(2) are satisfied. *Hekmati*, 278 F. Supp. 3d at 158 (evaluating section 1605A(a)(2) requirements as prerequisite to finding subject-matter jurisdiction). First, a plaintiff suing a foreign state for a terrorist act must show that the foreign state was "designated as a state sponsor of terrorism at the time [of] the act . . . or was so designated as a result of such act" and "either remains so designated when the claim [was] filed . . . or was so designated within the 6-month period before the claim [was] filed." 28 U.S.C. § 1605A(a)(2)(A)(i)(I). Second, at the time the act was committed, the claimant or victim must have been either a U.S. national, a member of the U.S. armed forces, or an employee of the United States performing on a contract awarded by the United States. *Id.* § 1605A(a)(2)(A)(ii). Finally, in cases like this one where "the act occurred in the foreign state against which the claim has been brought," the plaintiff must have afforded the foreign state a "reasonable opportunity to arbitrate the claim." *Id.* § 1605A(a)(2)(A)(iii).

These conditions are met here. The United States has continually designated Iran as a state sponsor of terrorism since January 19, 1984. *See* U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism (last visited Nov. 10, 2025). And, as indicated in his declaration, Mr. Lakestani became a naturalized U.S. national in 2018, just before Defendant detained and tortured him in 2019. ECF 19-3 ¶ 4; *see also Worley v. Islamic Republic of Iran*,

75 F. Supp. 3d 311, 326–27 (D.D.C. 2014) (accepting "[u]ncontroverted affidavit evidence" that the plaintiffs were U.S. citizens). Finally, Mr. Lakestani afforded Iran a reasonable opportunity to arbitrate by sending an offer to arbitrate via certified mail to Iran's ambassador to the United Nations and the Interests Section of the Islamic Republic of Iran at the Pakistani Embassy in Washington, D.C. ECF 19-40; *see Kar v. Islamic Republic of Iran*, No. 19-cv-2070 (JDB), 2022 WL 4598671, at *15 (D.D.C. Sept. 30, 2022) (finding requirement met when "plaintiffs sent offers to arbitrate the claims in their complaints by certified mail to the Iranian Interests Section of" the Pakistani Embassy in Washington D.C.); *Saharkhiz v. Islamic Republic of Iran*, No. 19-cv-2938 (RMM), 2023 WL 9196605, at *6 (D.D.C. Oct. 16, 2023) (transmitting an offer of arbitration via certified mail to Iran satisfies the § 1605A(a)(2) requirements), *report and recommendation adopted*, No. 19-cv-2938, ECF 29 (May 29, 2024). As a result, all of the requirements of subject-matter jurisdiction are met, and the Court can proceed to consider whether it has personal jurisdiction over Iran.

**B.    The Court Possesses Personal Jurisdiction Over Iran.**

The FSIA provides that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject-matter] jurisdiction" under 28 U.S.C. §1330(a) "where service has been made under [28 U.S.C. § 1608]." 28 U.S.C. § 1330(b). In other words, "under the FSIA, subject matter jurisdiction plus service of process equals personal jurisdiction." *Price*, 294 F.3d at 95 (quoting *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1548 n.11 (D.C. Cir. 1987)). The Court finds that it possesses personal jurisdiction over Iran in this case because Mr. Lakestani served Iran through diplomatic channels, as provided for in § 1608(a)(4).

The FSIA establishes four methods by which a party may serve a foreign state:

(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

(2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

(3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

(4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a)(1)–(4). These methods are listed in order of preference; a "plaintiff must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on." *Angellino v. Royal Family Al-Saud*, 688 F.3d 771, 773 (D.C. Cir. 2012).

The first two methods of service were unavailable to Mr. Lakestani. There are no special arrangements for service between Mr. Lakestani and Iran, *see* ECF 8-1 at 1, and Iran was not a party to any applicable international convention on the service of judicial documents when Mr. Lakestani sought to effect service, *see* U.S. Dep't of State, Bureau of Consular Affairs, *Service of Process*, https://perma.cc/US8A-NWD9 (archived July 17, 2023); U.S. Dep't of State, Bureau of Consular Affairs, *Iran Judicial Assistance Information*, https://perma.cc/VCJ5-9762 (archived July 17, 2023) (Iran not a signatory to the Hague Convention on the Service Abroad of Judicial

and Extra–Judicial Documents in Civil or Commercial Matters). As a result, Mr. Lakestani attempted to serve Iran under the third method, 28 U.S.C. § 1608(a)(3), by moving the Clerk of Court to mail Iran a copy of the summons, notice of suit, together with a copy each translated into Farsi, by registered mail, return receipt requested. ECF 5. The Clerk of Court mailed the documents to Iran, ECF 7, but service could not be made within the requisite 30 days because the package was rejected by Iran's Ministry of Foreign affairs and returned to Mr. Lakestani, ECF 8-1 at 1; ECF 17 at 1.

The third method of service being unavailable, Mr. Lakestani moved for service through diplomatic channels under 28 U.S.C. § 1608(a)(4). *See* ECF 8. As required by 28 U.S.C. § 1608(a)(4), he requested that the Clerk of Court mail two copies of the summons, the complaint, and notice of suit, together with a translation of each into Farsi, by certified mail to the Secretary of State in Washington, D.C., to the attention of the Director of Special Consular Services, ECF 8; ECF 8-1. The Clerk of Court mailed these documents to the U.S. Department of State. ECF 9. The State Department then transmitted the documents through the Embassy of Switzerland and confirmed that they were delivered to Iran's Ministry of Foreign Affairs on June 15, 2022. ECF 12 at 1; *see Schertzman Cohen v. Islamic Republic of Iran*, No. 17-cv-1214 (JEB), 2019 WL 3037868, at *4 (D.D.C. July 11, 2019) (service on Iran under section 1604(a)(4) is proper when service documents are transmitted to Iran's Ministry of Foreign Affairs through the Embassy of Switzerland). As a result, service on Defendant was effective as of June 15, 2022. *See* 28 U.S.C. § 1608(c)(1).[6] This final procedural requirement being satisfied, the Court finds that it possesses personal jurisdiction. *See* 28 U.S.C. § 1330(b).

---

[6] "Because the IRGC is part of the Iranian government, this procedure effectuated service on it as well under 28 U.S.C. § 1608(a)." *Schertzman Cohen*, 2019 WL 3037868, at *4.

### C.    Iran's Liability

Satisfied that it has jurisdiction to proceed, the Court turns to the merits of the complaint. Under the FSIA's terrorism exception, U.S. nationals and certain other eligible plaintiffs possess a private right of action to hold foreign state sponsors of terrorism—and their agents and employees—liable for "personal injury or death." *See* 28 U.S.C. § 1605A(c), (c)(1)–(4). However, this private right of action "does not itself provide the substantive basis for claims brought under the FSIA." *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 361 (D.D.C. 2020). Instead, plaintiffs asserting claims under the FSIA's terrorism exception must "prove a theory of liability which justifies holding the defendants culpable for the injuries that [a plaintiff] allege[s] to have suffered." *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 62 (D.D.C. 2021); *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 176 (D.D.C. 2010) ("[P]laintiffs in § 1605A actions—whether seeking solely punitive damages or pursuing compensatory relief as well—must articulate the justification for such recovery, generally through the lens of civil tort liability."). To determine whether a plaintiff has adequately alleged a substantive basis for their claims, courts "rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises." *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 353 (D.C. Cir. 2018).

Here, Mr. Lakestani qualifies for the terrorism exception's private right of action because he is a U.S. national and, "given the overlap between the elements of this cause of action and the terrorism exception to sovereign immunity, the availability of this claim has already been determined by the Court's subject matter jurisdiction analysis." *Selig*, 573 F. Supp. 3d at 62; *see supra* Section III.A. Mr. Lakestani's complaint presents several tort-law based theories in support of liability: assault and battery, false imprisonment, and intentional infliction of emotional distress

(framed as a claim for solatium). Consistent with the usual standard in this district, the Court assesses these claims under the principles adopted by the Restatement (Second) of Torts. *See, e.g.*, *Force*, 464 F. Supp. 3d at 361–62.

### 1. *Assault and Battery*

Count II of Mr. Lakestani's complaint alleges that Iran is liable for "assault and battery." ECF 1 ¶¶ 33–39. Under the Restatement, Iran is liable for assault if its agents "intend[ed] to cause a harmful or offensive contact with . . . or an imminent apprehension of such a contact" to Mr. Lakestani and he was "thereby put in such imminent apprehension." Restatement (Second) of Torts § 21(1) (1965). By "its very nature, torture" of the kind already detailed in this opinion "subject[s] the victim to imminent apprehension of harmful or offensive contact at all times while in captivity." *Abedini*, 422 F. Supp. 3d at 132–33 (noting that standard for assault satisfied while living in captivity where a prisoner "might be harassed or beaten for virtually no reason at all"); *see supra* Section I.A; Section III.A.2.a, c. Iran is plainly liable for assault.

Similarly, liability for battery arises if Iran's agents acted "intending to a cause a harmful or offensive contact with . . . , or an imminent apprehension of such contact" to Mr. Lakestani and "a harmful contact with [him] directly or indirectly results." Restatement (Second) of Torts § 13. Harmful contact includes "any physical impairment of the condition of another's body, or physical pain or illness." *Id.* § 15. Defendant's acts of physically restraining, drugging, and beating Mr. Lakestani—including with implements such as guns—undeniably satisfy this definition. *See, e.g.*, *Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 343 (D.D.C. 2016) ("[T]he acts of physical torture—e.g., chaining the hostages to one another and to trees . . . [and] imposing unwanted medical treatment on them—were direct, intentional, harmful contacts.").

21

### 2. *False Imprisonment*

Count III of the complaint raises a claim of false imprisonment, which arises when a defendant "acts intending to confine [a person] within boundaries fixed by the actor," the action "directly or indirectly results in such a confinement of the other," and the plaintiff "is conscious of the confinement or is harmed by it." *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 34 (D.D.C. 2001) (quoting Restatement (Second) of Torts, § 35 (1965)); ECF 1 ¶¶ 40–44. "Additionally, the plaintiff must demonstrate the 'unlawfulness of' [the] confinement." *Dawes v. Syrian Arab Republic*, No. 21-cv-2730 (RC), 2023 WL 8529288, at *9 (D.D.C. Dec. 8, 2023) (quoting *Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 912 (D.C. Cir. 2015)); *see also Wallace v. Kato*, 549 U.S. 384, 389 (2007) ("The sort of unlawful detention remediable by the tort of false imprisonment is detention *without legal process*."). Here, Plaintiff was detained in vile conditions and against his will for 47 days without "affording [him] any legal process whatsoever." *Dawes*, 2023 WL 8529288, at *9; *see supra* Section I.A; Section III.A.2. He was not permitted to leave until Iran "agreed to accept bail from [his] family," ECF 19-3 ¶ 29, and was otherwise physically restrained and prevented from leaving Defendant's custody for more than a month, *see generally* ECF 19-3. As a result, Iran is liable for false imprisonment.

### 3. *Intentional Infliction of Emotional Distress*

Finally, Count VII of Mr. Lakestani's complaint is properly "construe[d] . . . as invoking . . . relief via the lens of the civil tort of intentional infliction of emotional distress" (IIED). *Barry*, 410 F. Supp. 3d at 177; *see* ECF 1 ¶¶ 63–68. The complaint frames this claim as one for "solatium." ECF 1 ¶¶ 64. However, the FSIA defines solatium as a measure of damages, not an independent cause of action. *See Jenco*, 154 F. Supp. 2d at 37 n.9 (stating that section 1605A "clearly contemplates solatium recovery as a measure of *damages*, not as an independent cause of

action"). Even if the Court were to interpret this request as one for solatium damages rather than a cause of action, such damages are "intended to compensate persons for mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience . . . as well as the harm caused by the loss of the decedent's society and comfort." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015). Fortunately for Mr. Lakestani, he survived his ordeal and solatium damages are thus inapposite. However, his complaint can be easily construed as making a claim for IIED. Count VII of his complaint, while titled "solatium," seeks damages for his own suffering and mental anguish arising from these events, rather than that of third parties close to him, and expressly refers to the standard for IIED. ECF 1 ¶¶ 63–68. His memoranda in support of his motion for default judgment also refer to the standard for IIED rather than solatium. *See* ECF 19 at 25–27; ECF 23 at 2. Further, "solatium claims under the FSIA are functionally identical to claims for intentional infliction of emotional distress." *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 27 (D.D.C. 2014). Thus, the Court construes Plaintiff's solatium count as alleging the tort of intentional infliction of emotional distress. *See Barry*, 410 F. Supp. 3d at 177 (construing a complaint seeking "relief for mental and emotional anguish and pain and suffering" as invoking an IIED theory of recovery).

Under the FSIA, a defendant is liable for IIED if it "by extreme and outrageous conduct[,] intentionally or recklessly cause[s]" the plaintiff to suffer "severe emotional distress." Restatement (Second) of Torts § 46(1); *Roth*, 78 F. Supp. 3d at 400. "Severe distress must be proved," but in many cases "the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed." Restatement (Second) of Torts § 46 cmt. J; *see also Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002) (finding that all acts of terrorism result in the "highest degree of emotional distress, literally, terror, in their targeted audience").

This is one such case. The Court need not retread the abuse Mr. Lakestani endured; his uncontroverted declaration and the facts provided therein show that he suffered severe emotional distress because of Defendant's treatment of him while he was detained. *See, e.g.*, ECF 19-3 at ¶¶ 15–16, 20, 22, 25; *see also supra* Section I.A. The Court already found that this treatment constituted torture, and torture is "by [its] very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *See Roth,* 78 F. Supp. 3d at 401. As a result, Defendant is liable for IIED, along with the other torts described above, and Mr. Lakestani may recover damages under the terrorism exception's right of action.[7]

---

[7] The Court notes that the theories of liability discussed in this section are drawn from Mr. Lakestani's complaint. However, the relevant section of Mr. Lakestani's motion for default judgment is titled "intentional infliction of emotional distress," and omits discussion of the legal standards for assault, battery, and false imprisonment. *See* ECF 19 at 23–27. Typically, an argument not pursued in a motion for default judgment is considered abandoned. *Est. of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 241 n.8 (D.D.C. 2012). However, the Court declines to find that Mr. Lakestani has abandoned these theories of tort liability. Mr. Lakestani's motion for default clearly seeks recovery for not only "severe emotional distress" and the "bodily harm" that "results" from such distress (as is required for an IIED claim), *see* Restatement (Second) of Torts § 46, but also for the permanent physical damage and mental suffering he experienced because of Iran's physical abuse, threats of violence, and confinement, ECF 19 at 17, 24, harms all consistent with the other theories of liability articulated in his complaint. And, as discussed in this section, the conduct discussed in the complaint and supporting evidence clearly satisfies the standards for assault, battery, and false imprisonment in addition to IIED.

Further, past practice indicates that when evaluating the "theory of liability" requirement for section 1605A(c) liability, courts have often looked to the theories of harm as alleged in the plaintiff's complaint, and further, not always insisted on perfect clarity as to which tort theories justify relief. *See Barry*, 410 F. Supp. 3d at 177. For example, in a case where the parties' complaint relied on "general legal theories," that merely alleged "mental anguish, emotional pain and suffering, and/or economic losses," a court nevertheless "construe[d]" the complaint as invoking relief through "the lens of [the] civil tort of [IIED]." *Id.*; *see also Force*, 464 F. Supp. 3d at 362 (finding that where plaintiffs had alleged that they "suffered severe psychological, emotional and other personal injuries," but had not alleged a specific theory of tort liability, the court looked to the "closest common-law analogues to that claim" which were IIED or assault).

Courts in this district have also not uniformly required separate articulation of a tort-law theory of recovery for "money damages for . . . personal injuries" clearly caused by torture under circumstances similar to Mr. Lakestani's. *See Hekmati*, 278 F. Supp. 3d at 163. In *Hekmati*, the Plaintiff had alleged physical and psychological abuse at the hands of the Iranian authorities while detained, and the district court found that Iran had inflicted "physical and mental injuries" upon the Plaintiff. *Id.* at 151–55, 161. The district court found that this evidence demonstrated that Iran had engaged in torture for the purpose of satisfying the FSIA's terrorism exception. *See id.* at 159. In subsequently evaluating Iran's liability for the "personal injuries" resulting from that conduct, the district court did not independently evaluate whether the plaintiff had alleged theories of tort liability such as assault, battery, false imprisonment, or intentional infliction of emotional distress. *See id.* at 163. Instead, the district court simply found that the findings made during the jurisdictional analysis had also satisfied the elements for liability under section 1605A(c). *Id.*; *see also Kilburn*, 699 F. Supp. 2d at 155 (making a similar analysis).

This is all to say, that where, as here, Mr. Lakestani's complaint contains express reference to theories of assault, battery, and false imprisonment, the motion for default judgment does not explicitly reference those theories

### D.   Damages

The FSIA permits plaintiffs suing under § 1605A(c) to pursue money damages, including "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). "To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate consistent with this Circuit's application of the American rule on damages." *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–116 (D.D.C. 2005) (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003)). Courts look to expert testimony and prior awards for comparable injuries to determine a reasonable estimate of damages. *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 82–83 (D.D.C. 2017); *see also Reed*, 845 F. Supp. 2d at 213–15.

Plaintiff seeks damages for pain and suffering, economic, and punitive damages. ECF 19 at 23, 31; ECF 23 at 11–16. The Court finds that Plaintiff is entitled to pain and suffering, economic, and punitive damages, although not in the amounts he requests. For the reasons explained below, the Court finds that $14,233,204.88 is a reasonable estimate of Plaintiff's damages, and orders Iran to pay that amount.

### 1.   Pain and Suffering

Mr. Lakestani seeks compensatory damages for his pre- and post-release pain and suffering. ECF 19 at 26–27. He suggests $470,000 as the total quantum of damages to compensate him for the pain and suffering he endured during his detention, and requests $10 million dollars

---

but contains requests for damages that are nevertheless consistent with those theories of harm, and the evidence before the Court clearly shows conduct by Iran that satisfies those theories of harm, the Court declines to find that Mr. Lakestani has abandoned these theories of liability. Further, even were the Court incorrect about which theories of liability that Mr. Lakestani had proven in addition to IIED, the decision would have little practical effect because multiple recovery is prohibited. *See Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 74 (D.D.C. 2010) ("[P]laintiffs who have claimed assault, battery, and IIED may recover under only one of any such theories, as multiple recovery is prohibited.").

for his continuing pain and suffering. *Id.*; ECF 23 at 2. The Court has already determined that Defendant is liable for the pain and suffering Mr. Lakestani endured during his detention. *See supra* Section III.C. Further, "[p]ain and suffering, past and future, are obviously . . . reasonably certain consequence[s] of torture." *Hekmati*, 278 F. Supp. 3d at 163. As a result, the Court need only determine the appropriate measure of damages.

**Pre-Release Pain and Suffering Damages:** Obviously, "putting a number on these kinds of harms can be difficult." *Moradi*, 77 F. Supp. 3d at 70. The FSIA does not provide a specific formula to calculate damages for a surviving victim's pain and suffering, but "[t]he primary consideration in these cases is to ensure that individuals with similar injuries receive similar awards." *Hekmati*, 278 F. Supp. 3d at 163. Courts in this district typically set damages for prolonged and abusive captivity at $10,000 per day for the pain and suffering that victims experienced while imprisoned. *See id.* at 163–64 (collecting cases); *see also Rezaian*, 422 F. Supp. 3d at 179. Although Mr. Lakestani's detention was shorter than many of the detainees seen in this district, *see, e.g.*, *Kilburn*, 699 F. Supp. 2d at 157 ($5.03 million awarded for 503 days as hostage); *Massie v. Gov't of Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 77 (D.D.C. 2008) ($3.35 million awarded for 335 days of imprisonment), the Court sees no reason to deviate from the usual approach. In recognition of the pain Mr. Lakestani suffered on each of the 47 days he was detained, the Court issues an award of $10,000 per day of detention, totaling $470,000.

**Post-Release Pain and Suffering Damages:** While this $470,000 "represents a reasonable estimate of pain and suffering damages for [Mr. Lakestani's] time in confinement, it fails to account for the pain and suffering that [he] has experienced since [his] release." *Saberi v. Gov't of Islamic Republic of Iran*, 541 F. Supp. 3d 67, 83 (D.D.C. 2021). Under the FSIA, Mr. Lakestani is entitled to an additional sum to account for the physical and mental trauma he has endured since

release, and that he is likely to continue enduring for many years. *Id.* Determining post-release awards is "delicate terrain," and the Court looks to other prolonged detention cases for guidance. *Abedini*, 422 F. Supp. 3d at 137. As with compensation for pre-release suffering, the "guiding principle for compensating . . . post-release pain and suffering is that individuals with similar injuries receive similar awards." *Hamen v. Islamic Republic of Iran*, 407 F. Supp. 3d 1, 6 (D.D.C. 2019).

When calculating post-release awards in FSIA torture cases, "courts routinely consider (1) the length and severity of the plaintiff's torture and detention; (2) the extent of the plaintiff's lasting physical and mental injuries; and (3) the plaintiff's age at the time of release as well as the estimated number of years that the plaintiff can be expected to suffer from these injuries." *See Saberi*, 541 F. Supp. 3d at 83. In establishing a baseline for this inquiry, courts have followed the approach taken by the district court in *Hekmati*, 278 F. Supp. 3d at 163–65; *see Saberi*, 541 F. Supp. 3d at 83 (collecting cases following *Hekmati*). Amir Hekmati, an Iranian-American citizen, was detained by Iran and subjected to physical and psychological abuse. *Hekmati*, 278 F. Supp. 3d at 149–54. Among the injuries experienced during his 1,602 day imprisonment, much of which was passed in solitary detention in squalid conditions, Mr. Hekmati was repeatedly beaten, whipped, shocked by tasers, bound in painful positions for extended periods of time, and forcibly sedated. *Id.* at 151–54. He experienced lung, sinus, and intestinal infections for which his captors denied him treatment. *Id.* at 154. He was regularly threatened with violence and his psychological health greatly deteriorated. *Id.* at 151–52.

To calculate Mr. Hekmati's post-release damages award, the court considered the length of Mr. Hekmati's detention, his "age at the time of release (the length of time he will be experiencing pain and suffering)," and "the extent of [his] long-term injuries (the level of pain and

suffering)." 278 F. Supp. 3d at 163–64; *see also Saberi,* 541 F. Supp. 3d at 83. The Court held that a $10 million post-release pain and suffering award appropriately accounted for the length of Mr. Hekmati's detention, his injuries which were "severe and likely to persist," and his 45-year life expectancy at release. *Hekmati*, 278 F. Supp. 3d at 164. Since then, courts in this this district have adopted *Hekmati*'s $10 million award as a baseline and adjusted that amount to reflect varying lengths of detention, life expectancies, and severity of abuse or injury. *See Saberi*, 541 F. Supp. 3d at 83–84 (awarding $9 million to a plaintiff with a 50 year life expectancy but who was detained for 100 days and "did not experience the same degree of physical abuse" as Mr. Hekmati); *Abedini*, 422 F. Supp. 3d at 137 (awarding $9.6 million to a plaintiff with a 43.2 year life expectancy); *Azadeh*, 2018 WL 4232913, at *20 (awarding $8.89 million to plaintiff with a 40 year life expectancy). This Court takes the same approach.

 First, the Court acknowledges that Mr. Lakestani survived a horrific ordeal and continues to struggle physically and psychologically because of what he went through. *See*, *e.g.*, ECF 19-3 ¶¶ 33–36; ECF 23-18 ¶¶ 6–8. What Defendant did to Mr. Lakestani was inhumane, and no one should have to endure what he did. However, his request for $10 million dollars in post-release pain and suffering damages is inconsistent with the analysis in *Hekmati* and the cases that follow it. Mr. Lakestani argues that his situation mirrors that of Mr. Hekmati and Mr. Rezaian, *see* ECF 19 at 26–27, another victim of torture and hostage-taking who was awarded $10 million in post-release damages*, see Rezaian*, 422 F. Supp. 3d at 180–81. That comparison is fair in many ways— all three men were detained and tortured by Iran and incurred severe and persistent physical and emotional injuries from which they are unlikely to recover. *See Hekmati*, 278 F. Supp. 3d at 164 (noting plaintiff's injuries were "severe and likely to persist"); *Rezaian*, 422 F. Supp. 3d at 172– 73, 180 (highlighting plaintiff's "long-term psychological" and "physical afflictions" such as

"pulmonary and respiratory issues," "back problems," "severe anxiety," and stress-induced psoriasis, all resulting from a lengthy imprisonment and harrowing interrogations). But Mr. Hekmati and Mr. Rezaian were detained for significantly longer than Mr. Lakestani—1,602 and 544 days, respectively—and were younger and thus had considerably longer life expectancies on release. *See Hekmati*, 278 F. Supp. 3d at 164 (released at 32 with over 45-year life expectancy); *Rezaian*, 422 F. Supp. 3d at 180 (released at 40 years old). Mr. Lakestani was 50 years old when he was released, *see* ECF 19-3 ¶¶ 1, 30, and would have had a 29.9-year life expectancy at that point, *see*, *e.g.*, *National Vital Statistics Reports*, Vol. 70, No. 19 (Mar. 22, 2022); *see also Hekmati*, 278 F. Supp. 3d at 164 (relying on National Vital Statistics Report to determine life expectancy).

Mr. Lakestani acknowledges that he was detained for less time than Mr. Hekmati and Mr. Rezaian, and that he had a shorter life expectancy upon release. ECF 23 at 10–11. However, he argues that a $10 million award is warranted because "[his] constantly deteriorating health and physical conditions" set his post-release suffering apart from those in other cases, as his health is "constantly getting worse rather than a relatively stagnant level with no newly acquired injuries." *Id.* at 11. In addition to ongoing chronic pain in his shoulders, arms, and back and post-traumatic stress disorder, Mr. Lakestani has also suffered new complications stemming from his treatment in captivity, which included his extended shackling, beatings, and the withholding of his diabetes medication, ECF 19-3 ¶¶ 13, 15, 17, 21, 27. Those complications include the deterioration of his vision, kidney function, and the amputation of his entire right leg below the knee due to repeated infections in his ankles. ECF 23-18 ¶¶ 6–9. However, there is nothing before the Court to suggest that Mr. Hekmati, Mr. Rezaian, or any other torture victim did not also have continuing and gradually worsening post-release injuries. That the district court in *Hekmati* observed that Mr.

Hekmati's "injuries are severe and likely to persist" does not mean the court assumed his injuries would remain stagnant. 278 F. Supp. 3d at 164. Finding no precedent to suggest that Mr. Lakestani's worsening injuries are unique among torture victims, the Court finds that a $10 million award is inappropriate here, given Mr. Lakestani's shorter life expectancy compared to the *Hekmati* baseline, and his substantially shorter period of captivity compared to that endured by Mr. Hekmati and Mr. Rezaian.

Instead, the Court looks to a case featuring victims that share similar life expectancies to Mr. Lakestani: *Doe A-1 v. Democratic People's Republic of Korea*, No. 18-cv-0252 (DLF), 2021 WL 723257 (D.D.C. Feb. 24, 2021). In *Doe A-1*, Plaintiffs C-01 and C-24 were both detained and tortured by a foreign state, had a 25-year life expectancy at release, and received $5 million dollars in post-release damages. *Id.* at *6. As with other courts in this district, the *Doe A-1* court calculated these $5 million awards by prorating *Hekmati*'s $10 million award to account for Plaintiff C-01 and C-24's shorter life expectancies. *See id.* at *4–*6; *see also Saberi*, 541 F. Supp. 3d at 84 (adopting $10 million baseline and adjusting to account for plaintiff's life expectancy); *Azadeh*, 2018 WL 423913, at *20 (same). That approach is warranted here. When broken down by year, Mr. Hekmati's award comes out to $222,222.22 per year for his 45-year life expectancy. A similar proportional calculation for Mr. Lakestani's 29.9-year life expectancy results in a $6,644,444.44 award in post-release pain and suffering damages. Combined with his pre-release damages, this totals $7,114,444.44.

### 2. *Economic Damages*

Plaintiff also seeks past economic damages incurred from treatment related to his injuries. ECF 23 at 11–12. "As with pain and suffering damages, economic damages must be proven by a reasonable estimate." *Rezaian*, 422 F. Supp. 3d at 181. But "unlike damages for pain and suffering,

lost earnings" and any incurred medical expenses "are not hard to quantify." *Moradi*, 77 F. Supp. 3d at 71. As a result, economic damages must be supported "with competent evidence." *Id.* In FSIA cases, "[t]he report of a forensic economist may provide a reasonable basis for determining the amount of economic damages." *Reed*, 845 F. Supp. 2d at 214; *Saberi*, 541 F. Supp. 3d 67, 84–86 (relying on two expert reports to determine the total lifetime costs for ongoing treatment).

In support of his demand for medical expenses, Plaintiff proffers a spreadsheet listing his medical expenses between January 1, 2021, and January 22, 2024. *See* ECF 23-17. Plaintiff purports that these expenses total $1,101,451.23, with $81,846,78 coming due, and that the expenses stem from treatment for injuries he incurred while detained and their later complications. ECF 23 at 14–16. The Court has no doubt that Mr. Lakestani has received extensive, and expensive, medical treatment since escaping Iran. Indeed, the materials that Mr. Lakestani has submitted to the Court provide evidence of various doctor's visits and hospital admissions. *See, e.g.*, ECF 23-7; ECF 23-11; ECF 23-15. But, as Mr. Lakestani acknowledges, plaintiffs seeking economic damages under the FSIA must provide clear evidence of expenses incurred. *See* ECF 23 at 15. Plaintiff's spreadsheet is insufficient for that purpose, even when reviewed in light of the other materials presented regarding Mr. Lakestani's health issues, because it does not establish which costs Plaintiff specifically incurred because of Defendant's conduct. First, the entries in the spreadsheet give no indication what each charge was for or what ailment the medical service provider might have addressed. *See, e.g.*, ECF 23-17 at 1 (reporting an $20.99 bill for an unspecified service from "null provider" on January 2, 2022). The Court has no way to tell whether a given expense is related to Plaintiff's injuries or an unrelated health issue. Second, the spreadsheet is not certified in any way—not even by Plaintiff's declarations. *See* ECF 23-18 ¶¶ 8–9 (describing "financial strain from unpaid medical bills" without referencing the precise amount

or the spreadsheet). The Court acknowledges that Mr. Lakestani's exhibits to his memorandum on economic damages contain evidence of his various doctors' visits that relate to injuries from his imprisonment, ones that likely resulted in at least some of the charges in his spreadsheet. However, those records largely do not indicate the costs of the procedures or connect the procedures to Mr. Lakestani's purported expenses in his spreadsheet. The exception is Plaintiff's Exhibit 12, which includes medical records relating to Plaintiff's orthopedic treatment, along with a sheet indicating $2,158.00 in charges associated with those specific dates of service. *See* ECF 23-12 at 38–40. None of the other medical records include similar billing or cost information.

It is not the Court's job to sift through Mr. Lakestani's medical records to attempt to tie the services documented in those records to specific charges on the spreadsheet, or attempt to determine whether any of the charges in the spreadsheet relate to unrelated health conditions that should not be included as part of his damages here. The letters submitted from the providers, the accompanying medical records, and even Mr. Lakestani's supporting declaration do not make clear what the majority of the expenses listed on the spreadsheet were for, let alone whether they are expenses incurred for injuries that a medical professional determined he sustained because of his torture and detention. While the Court is sympathetic to Mr. Lakestani's situation and understands that he likely has many medical expenses, it cannot grant the full amount of his requested economic damages without competent evidence. *See Moradi*, 77 F. Supp. 3d at 71. While the Court finds that Mr. Lakestani has substantiated his economic damage claims with respect to $2,158.00 of medical expenses, *see* ECF 23-12 at 38–40, his remaining evidence asks this Court to engage in guesswork that cannot suffice as "a reasonable estimate" of his economic damages, *Moradi*, 77 F. Supp. 3d at 71. The Court may reconsider this determination should Plaintiff provide evidence more clearly spelling out the relationship between his post-injury treatments as

documented in the medical records and the resulting medical expenses that he has paid. *See, e.g.,* *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 56 (D.D.C. 2018) (granting $96,375.80 in medical expenses upon review of "itemized medical bills" for services from specific hospital providers); *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 123, 129, 136 (D.D.C. 2005) (awarding $14,221.85 for medical expenses based on the depositions of treating psychiatrist); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 265, 275 (D.D.C. 2003) (granting $10,882.87 for medical expenses for removal of shrapnel, burn scars, and surgery based on deposition of family member who paid for treatment); *Saberi*, 541 F. Supp. 3d at 86 (awarding $46,346.81 in "ongoing medical expenses" based on expert reports estimating the plaintiff's "total lifetime costs for . . . ongoing treatment").

Thus, the Court awards Mr. Lakestani $2,158.00 in economic damages, bringing his compensatory damages total to $7,116,602.44.

### 3. *Punitive Damages*

The final category of damages in question is punitive damages. "Courts routinely award punitive damages in cases brought under the terrorism exception to the Foreign Sovereign Immunities Act." *Saberi*, 541 F. Supp. 3d at 87. These damages are "not meant to compensate the victim but to punish outrageous behavior and deter such outrageous conduct in the future." *Abedini*, 422 F. Supp. 3d at 140. "Courts have repeatedly held, in section 1605A cases, that Iran's actions," including its detention and torture of prisoners, "were outrageous, and imposed substantial punitive damages awards as a result." *Rezaian*, 422 F. Supp. 3d at 183 (collecting cases); *see e.g.*, *Saberi*, 541 F. Supp. 3d at 87; *Hekmati*, 278 F. Supp. 3d at 166; *Abedini*, 422 F. Supp. 3d at 141–42. The Court has no difficulty finding that Iran's conduct in this case,

which involved subjecting Mr. Lakestani to extreme and deplorable abuse, again satisfies the relevant standard. *See supra* Section I.A; Section III.A.2.a. Punitive damages are warranted.

The Court considers four factors to determine the appropriate sum of punitive damages: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Hekmati*, 278 F. Supp. 3d at 166. With respect to the first two factors, Iran's torture and treatment of Mr. Lakestani was cruel and deserving of condemnation. *See Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 291 (D.D.C. 2015) (awarding punitive damages where North Korea tortured plaintiffs and "caused irreparable emotional and psychological harm"). "Iran's conduct of imprisoning and torturing Iranian-American citizens is part of a longstanding pattern and policy, making the need for deterrence clear." *Abedini*, 422 F. Supp. 3d. at 141. And courts have recognized that Iran has "substantial wealth." *Id.* With these factors in mind, the Court must consider which method of calculating that award is best suited to Mr. Lakestani's situation.

Even when punitive damages are clearly warranted, "[c]alibrating the actual amount of punitive damages for cases brought under the FSIA . . . is never a simple task." *Abedini*, 422 F. Supp. 3d at 141. Over the last four decades, courts in this district have developed several methods of calculating punitive damages in these cases. *See Christie v. Islamic Republic of Iran*, No. 19-cv-1289 (BAH), 2020 WL 3606273, at *21–22, 22 n.17 (D.D.C. July 2, 2020). "For cases against Iran specifically, judges here have used at least four different methods over the past nineteen years." *Abedini*, 422 F. Supp. 3d at 141. These are: (1) "the *Flatow* method," which calculates punitive damages by applying a set multiplier to Iran's annual expenditures on terrorism; (2) an award of a fixed sum of money, often hundreds of millions of dollars; (3) applying "a court-

34

determined multiplier on compensatory damages," and (4) awarding "punitive damages equal to compensatory damages." *Id.* (citing *Flatow v. Islamic Republic of Iran*, 999 F. Supp 1, 32 (D.D.C. 1998)).

Plaintiff asks the Court to employ the second method and award him a flat fee of $150 million in punitive damages. He likens his situation to the plaintiffs in *Rezaian*, who received heightened punitive damages awards under this approach because of the exacerbating factor that Iran detained and tortured the victim to increase its bargaining power with the United States in ongoing negotiations, *see Rezaian*, 422 F. Supp. 3d at 184, or the plaintiffs in *Kim*, who received a heightened award after a finding that the foreign state had engaged in the "abduction and presumed torture" of "missionaries seeking to aid refugees," *Kim*, 87 F. Supp. 3d at 291.

But the Court does not find that the flat fee approach is warranted. It "is more typically employed when similar conduct has never been litigated or in cases of terrorist attacks more deadly than what happened" to Mr. Lakestani in this case, *Saberi*, 541 F. Supp. 3d at 87, including cases of targeted killings and bombings, *see Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 56 (D.D.C. 2012). And Mr. Lakestani's case is dissimilar to that of the plaintiff in *Rezaian*, who was awarded $150 million under this approach because of the "exacerbating factor" that Iran sought to use Mr. Rezaian's detention to increase its leverage in negotiations with the United States. Mr. Lakestani has not shown that his detention, while also egregious, presents similar exacerbating factors. Mr. Lakestani's case is also different from that of *Kim*, which involved the abduction and presumed killing of the victim, making it more like the targeted killing cases than detention cases.

The Court finds that the fourth method is the most appropriate here. Awarding punitive damages equal to compensatory damages is the method adopted by a number of recent decisions in this district involving highly similar situations of "Iranian-American citizens who were falsely

imprisoned and tortured in Iranian prison." *Abedini*, 422 F. Supp. 3d at 142 (awarding $23 million punitive damages award equivalent to plaintiffs' compensatory damages); *see also Hekmati*, 278 F. Supp. 3d at 166–67 (awarding $31 million punitive damage award on same theory); *Moradi*, 77 F. Supp. 3d at 73 (awarding $10 million punitive damage award); *Saberi*, 541 F. Supp. 3d at 84, 87 (applying the equivalency approach). As the district court noted in *Abedini* when reviewing the propriety of this approach, this method has benefits in that it "provides 'a bad man' with a modicum of predictability," and allows a judge to retain discretion to "tailor a punitive award appropriate to the magnitude of the underlying injury." 422 F. Supp. 3d at 142.[8]

For these reasons, the Court awards Mr. Lakestani $7,116,602.44 in punitive damages, equal to his compensatory award.

## IV.    CONCLUSION

For the foregoing reasons, Mr. Lakestani's motion for default judgment, ECF 19, is **GRANTED**. Mr. Lakestani's motion for a status conference regarding the status of this case, ECF 24, is **DENIED** as moot given the issuance of this opinion. A separate order consistent with this decision accompanies this memorandum opinion.

_____
JIA M. COBB
United States District Judge

Date: November 10, 2025

---

[8] The Court also declines to apply a multiplier to the compensatory damage award. Mr. Lakestani has not requested this approach, and it has only been used in "special circumstance[s]," namely actions "against Iran by hundreds of plaintiffs who were family members or victims themselves of" the 1983 Beirut bombing. *Abedini*, 422 F. Supp. 3d at 142; *Saberi*, 541 F. Supp. 3d at 87 (declining to find similar "special circumstances" in case resembling Mr. Lakestani's). The Court declines to apply this approach outside of that unique context. Nor does the Court consider the propriety of applying the *Flatow* method as Mr. Lakestani has admitted it is inappropriate here. *See* ECF 19 at 29.